

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 2-08-122-CV

AARON BRUTON                                                          APPELLANT

V.

UNDERWRITERS AT LLOYD'S,                                             APPELLEES
LONDON, MARSHALL CONTRACT
ADJUSTERS, INC., JAMES NICHOLS,
CASUALTY TRUCK & EQUIPMENT,
INC., AND BOBBY COGGIN

------------

### FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

### I. Introduction

In two issues, Appellant Aaron Bruton asserts that this appeal should be

abated for the trial court to file findings of fact and conclusions of law and that

Appellee Underwriters at Lloyd's London ("Underwriters") failed to acquire

equitable title to Bruton's trailer by tendering payment of the policy limits. We reverse and remand.

## II. Factual and Procedural History

Bruton, a self-employed truck driver, bought a 1996 Clement trailer in August 1999 for $12,500.[1] Soon thereafter, he purchased a $10,000 insurance policy for the trailer from Underwriters. Around October 17, 2001, the trailer tipped over while dumping a load of rock; Bruton towed the trailer into Vantage Trailer for repairs.[2] Bruton reported a claim to Underwriters and advised them that certain repairs were necessary for the trailer to dump again.

The adjuster, Appellee James Nichols, employed by Appellee Marshall Contractors, Inc., determined that the cost to repair the trailer would be approximately $14,600. Based upon this estimate, Marshall Contractors, Inc. declared the vehicle totaled and through its agent, Rocky Engblad, placed the trailer up for salvage bids. Appellee Casualty Truck & Equipment, Inc. ("Casualty") submitted a bid.

---

[1] This amount reflects a subtraction from the total price of $19,300 for the trade-in value of a 1969 Hobbs trailer.

[2] As a result of the accident, the front cap portion of the tarp was torn, the dump arms were twisted and mangled, and the kingpin on the fifth wheel had to be be cut off so that the trailer could be towed into the repair shop.

Around October 24, 2001, Nichols notified Casualty that it had made the highest bid and he instructed Casualty to: "Please pick up trailer at Vantage. Will send title once we conclude with Insured. Thanks, James Nichols, Hartford Lloyds UNDERWRITERS Insurance Company." Two days later, Casualty paid a $100 storage fee and towed the trailer back to its place of business. Casualty had a remaining balance of $700 to be tendered upon receipt of title. Around October 29, 2001, despite not having received title to the trailer, Casualty purported to sell the trailer to Willie Bradford for approximately $1,500.

On October 31, 2001, Bruton received payment in full under the policy in the amount of $9,000[3] conditioned on the execution of a power of attorney appointing a principal of Marshall Contractors, Inc. to transfer title to the trailer. Bruton did not execute the power of attorney, nor attempt to negotiate the draft, but instead he made attempts to work a deal with Underwriters whereby he would receive the trailer back by paying the salvage value of the trailer, with Underwriters paying to him the remaining difference between the policy limits and the deductible plus the salvage value.

---

[3] $10,000 (policy amount) - $1,000 (deductible).

According to Bruton, he did not discover that the trailer was no longer at the repair shop until the Saturday after Thanksgiving 2001. At that time, Bruton contacted Nichols, who informed him that the trailer had been sold to Casualty as salvage. Bruton then contacted Casualty's principal, Appellee Bobby Coggin, to determine what had happened to the trailer. Coggin told Bruton that the trailer had been cut up for salvage.

Around June 13, 2002, Bruton discovered that the trailer had not, in fact, been cut up for salvage, and he confronted Bradford at a truck stop in order to confirm that the trailer was actually his; Bruton claimed that the VIN number and the license plate had both been changed but the trailer was, in fact, his. Bradford informed Bruton that he had purchased the trailer from Coggin and that Casualty had title to the vehicle. In June 2002, however, because Bradford was unable to properly tag and license the trailer, he returned the trailer to Casualty. Bruton then sought help from the Department of Public Safety ("DPS") in an attempt to recover his trailer; this resulted in the trailer being impounded sometime during September 2002, at Casualty for approximately two years, until March 2004.[4]

_____

[4] According to Casualty, during the two years that the trailer remained on its lot, Casualty was never paid any storage fees, was never contacted by Bruton, and was never instructed to return the trailer to Bruton by any party.

4

Casualty made numerous attempts to obtain title from Marshall Contractors, Inc.; however, after twenty-one months without any success, DPS Trooper David Martinez told Casualty to inquire about a sheriff's auction. On March 10, 2004, Casualty took the trailer to a licensed storage facility in Amarillo. On March 17, 2004, all lienholders and owners were notified of the impeding sheriff's auction, and on May 25, 2004, Bruton's counsel and Underwriters' counsel were sent notice from Marcus Norris, the City Attorney of Amarillo, that the trailer was impounded and it would be placed on the auction block in one week unless a party redeemed it. On June 3, 2004, because no party had reclaimed the trailer, it was assigned to Casualty free and clear of all liens and claims of ownership.

Bruton filed suit against Underwriters, Marshall Contractors, Inc., and Nichols for breach of contract, breach of the duty of good faith and fair dealing, violations of article 21.21 of the insurance code, violations of the Deceptive Trade Practices Act, and conversion. Bruton later amended his petition to include claims for conversion against Coggins, Casualty, and Bradford. In December 2005, by an agreed order of the trial court, the trailer was returned to Bruton, who used the trailer up to the time of trial.

Bruton alleged he suffered damages by his loss of use of the trailer. He initially leased a replacement trailer for two months at a total cost of

5

approximately $2,100, and then he financed the purchase of a replacement trailer, costing approximately $24,000. The parties stipulated that the value of the damaged trailer before the accident was $15,250. Bruton testified that the cost to repair the trailer to return it to operable condition was approximately $1,300. Bradford informed Bruton that he had performed $2,200 worth of work on the trailer. Nichols determined that the cost to repair the trailer was approximately $14,600. According to Bruton, however, only some of the repairs listed on Nichols's estimate were necessary in order to return the truck to operable condition.

In August 2007, at the close of the evidence, the trial court instructed the parties to submit written briefs on the following issue: when an insurance company tenders full payment of the covered loss in payment of a claim, is it permitted to dispose of the property under a legal and equitable title theory, or is it prohibited from doing so until it receives the power of attorney signed by the insured? After considering the briefs of all parties, the trial court sent notice of its intended ruling and signed the final judgment on December 26, 2007, awarding Bruton $9,000 less various offsets for a total of $6,648.41. The trial court ordered Bruton to deliver the trailer to Casualty, and further ordered Casualty to pay Underwriters $700 as salvage for the trailer. Finally, the trial court ordered that Bruton take nothing against the remaining

6

defendants and that he was not entitled to attorneys' fees. Bruton now appeals the trial court's judgment.

### III.  Equitable Title

In his second issue, Bruton asserts that the trial court erred by holding that Underwriters obtained equitable title to his trailer upon tendering payment of the policy limits.

We review the legal conclusion regarding equitable title de novo. *Yfantis v. Balloun*, 115 S.W.3d 175, 179 (Tex. App.—Fort Worth 2003, no pet.). It is axiomatic that an insurance policy is an insurance contract and the insurer's liability under the contract, if any, is based on its terms and provisions. *State Farm Fire & Cas. Co. v. Griffin*, 888 S.W.2d 150, 156 (Tex. App.—Houston [1st Dist.] 1994, no pet.). We construe insurance policies according to the same rules of construction that apply to contracts generally. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Crocker*, 246 S.W.3d 603, 606 (Tex. 2008). Enforcing the parties' expressed intent is our primary concern. *See Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994). If an insurance contract uses unambiguous language, we must enforce it as written. *See Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex. 1984). If, however, a contract is susceptible to more than one reasonable interpretation, we will resolve any ambiguity in favor of the insured. *Id*. at 938. Policy terms are

7

given their ordinary and commonly understood meaning unless the policy itself shows the parties intended a different, technical meaning. *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 736 (Tex. 1990). "No one phrase, sentence, or section [of the policy] should be isolated from its setting and considered apart from the other provisions." *Forbau*, 876 S.W.2d at 134.

Bruton asserts that Underwriters did not acquire equitable title to his trailer merely by tendering payment of the policy limits. In response, Underwriters argues that under the plain meaning of the policy's language, they did, in fact, have the right to take Bruton's trailer once they had tendered payment for the agreed value, in this case the policy limits.

Underwriters contends that based on the following language in the policy: "[it] shall be optional with the Underwriters to take all or any part of the property at the agreed or appraised value," it received equitable title to Bruton's trailer upon the tendering of payment. However, we cannot and do not agree with this conclusion. There is nothing in the plain language of the policy that would have put Bruton on notice that once Underwriters tendered him a check, he would lose all rights to his property. Although the policy unambiguously provides Underwriters with the right to take possession of the property, the policy fails to mention *when* that right attaches. Underwriters's assertion that the right attaches upon the tendering of payment is but one interpretation.

8

Another reasonable interpretation would be that the right does not attach until the insured has negotiated the check and executed a power of attorney to assign title. Therefore, because we are to resolve any ambiguity in favor of the insured, we hold that Underwriters did not have the right to sell Bruton's trailer until Bruton had negotiated the check and executed the power of attorney. *Puckett*, 678 S.W.2d at 938. Accordingly, we sustain Bruton's second issue.[5]

## IV. Conclusion

Having sustained Bruton's second issue and having disposed of Bruton's first issue, we reverse and remand the judgment of the trial court for further proceedings consistent with this opinion.

BOB MCCOY
JUSTICE

PANEL: LIVINGSTON and MCCOY, JJ.; and WILLIAM BRIGHAM (Senior Justice, Retired, Sitting by Assignment).

BRIGHAM, J. dissents without opinion.

DELIVERED: April 2, 2009

---

[5] Because we determine that Underwriters did not obtain equitable title to Bruton's trailer upon tendering payment of the policy limits, we need not address Bruton's first issue pertaining to findings of fact and conclusions of law. *See* Tex. R. App. P. 47.1.

9