# IN THE SUPREME COURT OF TEXAS

No. 14-0293

JASON R. SEARCY, AS TRUSTEE OF THE EXEMPT ASSETS TRUST,
PETITIONER,[1]

v.

PAREX RESOURCES, INC.,
RESPONDENT

*-consolidated with-*

No. 14-0295

JASON R. SEARCY, AS TRUSTEE OF THE EXEMPT ASSETS TRUST,
PETITIONER,

v.

PAREX RESOURCES (BERMUDA), LTD.,
RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS

**Argued December 10, 2015**

---

[1] This party is a bankruptcy trustee and successor to the claims of ERG Resources, LLC ("ERG")—the company that was originally before us, but which has since become insolvent. For convenience, we continue to refer to the trustee via its predecessor-in-interest's name ("ERG").

JUSTICE WILLETT delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GREEN, JUSTICE JOHNSON, JUSTICE LEHRMANN, and JUSTICE DEVINE joined.

JUSTICE GUZMAN filed an opinion concurring in part and dissenting in part, in which JUSTICE BOYD joined.

JUSTICE BROWN did not participate in the decision.

This complicated jurisdiction case involves multiple corporations, countries, and continents.

Here is the SparkNotes summary. A Bermudian entity was the sole shareholder of Class A shares of another Bermudian entity that owns certain Colombian oil and gas operations. The Bermudian shareholder sought to sell these shares and entered into a share purchase agreement, negotiated in Texas, with a Texan entity. The deal fell through, and so the Bermudian shareholder searched for other buyers. After a Canadian entity pursued the shares, the Texan entity sued both the Canadian entity and the Bermudian shareholder in Texas for tortious interference with its share purchase agreement. The Texan entity also sued the Bermudian owner of the Colombian oil and gas operations in Texas for fraud.

We hold that when the Canadian entity sought to purchase shares of a Bermudian entity that owns Colombian assets from a Bermudian shareholder and did not intend to develop a Texas business, it did not purposefully avail itself of Texas's jurisdiction. The Canadian entity's contacts with Texas were too fortuitous and attenuated for the exercise of specific jurisdiction over the entity to be consistent with due process. Indeed, even considering the extent of the communications between the Canadian entity and the Bermudian shareholder's executives in Texas—communications that were certainly voluminous, and, as is usual these days, electronic—the Canadian entity had no control over where the employees of the Bermudian shareholder happened

2

to be located. Moreover, the Canadian company did not desire to create an ongoing relationship with Texas, enjoy the benefits of our laws, or profit from our thriving economy. The Bermudian shareholder who owned shares related to the Colombian assets—and it does matter that those assets were Colombian, not Texan—could have employees located anywhere in the world; the location of its executives in Texas, and their corresponding communications with the Canadian entity, were totally fortuitous. This coincidence is insufficient to confer jurisdiction over the Canadian entity.

We also hold, however, that Texas courts have specific—although not general—jurisdiction over the Bermudian owner of the Colombian oil and gas operations. The claims against the Bermudian owner turn on its Texas-based executives' alleged misrepresentations in Texas to a Texas entity. These executives had the authority to sell the shares, and held themselves out as such over many years. Such entanglement with Texas is thus substantial enough to confer specific jurisdiction, and the trial court had sufficient evidence to so hold. But while this relationship between Texas and the claims alleging malfeasance stemming from the actions of the executives here, and of those to whom they gave marching orders, is relevant to the specific jurisdiction analysis, these contacts are insufficient to confer general jurisdiction over the Bermudian owner.

We thus affirm judgment of the court of appeals.

## I. Factual Background.

Several corporate entities are involved in this case:

- ERG is a company based in Houston.[2]

---

[2] As noted above, we refer to Petitioner as "ERG" for convenience since ERG Resources, LLC was initially before the Court. That limited liability company has become bankrupt. The trustee of the bankruptcy estate, as reflected in this case's style, and who acts as the assignee of ERG's claims, is Jason R. Searcy.

- Parex Resources, Inc. ("Parex Canada") is a Canadian energy company that focuses on Latin American assets.
- Nabors Industries, Limited ("Nabors") is a Bermudian company with operations in Houston.
- Ramshorn International, Limited ("Ramshorn") is a Bermudian company that maintained oil and gas operations in Colombia. Nabors' subsidiary owned all the Class A shares of Ramshorn.



Nabors decided to divest its stake in Ramshorn, and requested bids for its Class A shares during Fall 2011. ERG expressed an interest in purchasing the shares. Claudia Arango, Ramshorn's general manager in Colombia, prepared a presentation about the company's operations there. The presentation indicated that Ramshorn had rights to explore a certain portion of the outer continental shelf off Colombia via the waters of the so-called "Jag-A block."

In early 2012, Edgar Dunne, ERG's Chief Operating Officer, and Jordan Smith, Nabors' Head of Global Explorations, went to Colombia where Ramshorn allegedly represented that it had a 95 percent interest in the Jag-A block, subject to approval by the Colombian government. Ramshorn allegedly claimed that it acquired this interest through an agreement with a different company, Columbus Energy Limited ("Columbus").

Later in January 2012, Dunne and various colleagues from ERG attended a meeting with Nabors representatives in Houston. A Nabors attorney, Scott Peterson, allegedly claimed that Ramshorn had clean title to the Colombian operations, and that it controlled Columbus. ERG then sent Nabors a formal letter of intent dated February 17, 2012, offering to purchase the shares for $31.5 million. On the road to a deal, ERG continued to conduct due diligence, in part by reviewing documents in a virtual data room that was hosted by a Texas server. During the ongoing negotiations, Nabors' head of global exploration, Jordan Smith, made various representations about the Colombian assets; Nabors' due diligence materials identified him as Ramshorn's president; and Arango appeared to think him to be her boss. Smith was instrumental in Ramshorn's critical decision-making, and Arango was required to seek his permission for many large capital expenditures. Moreover, Smith was in charge of Nabors' divestment of shares like the Ramshorn shares, and worked with Arango to sell them.

But the deal's progress began to falter. Back in 2010, Nabors had publicly announced its desire to sell the Ramshorn shares, and had retained Royal Bank of Canada (RBC), which is, of course Canadian, as its financial adviser. Smith had then contacted a Calgary-based RBC employee, Bevin Wirzba, who worked on facilitating the prior sale which ultimately did not occur. Now fearing that the ERG transaction would not close, Smith again reached out to Wirzba, as Smith indicated in his deposition by ERG:

> Q: Okay. And did there come a later point in time in 2011 or 2012 when you went back to RBC and asked them if they could help you sell shares and associate in that sense?
> A: Yes. Once ERG had declined any interest in pursuing the project any further, I contacted Royal Bank of Canada and asked them if they wanted to go back to various of the companies that we had talked to in 2010 and see if they knew if they were interested in buying the shares . . . .

5

As a result of Smith's request that Wirzba to reinitiate contact with these prior putative buyers, RBC—aware that Parex Canada wanted to expand its Colombian portfolio—notified Parex Canada about Nabors' renewed desire to sell the shares:

Q: Who were . . . the people that you wanted RBC to contact?
A: The people that had been previously contacted during the 2010 effort to sell.
Q: Well, who had—who were those—who were those people?
A: Oh, gee whiz. I think that all told back in 2010 we had . . . probably contacted 50 companies.
Q: Okay. Did it include Parex?
A: Included Parex.

After being contacted by RBC, Parex Canada drafted a letter of intent, sent it to RBC, and thus formally engaged RBC to facilitate the deal. Wirzba then sent the letter to Nabors on behalf of Parex Colombia, which is wholly owned by one of Parex Canada's wholly owned subsidiaries, Parex Barbados. Parex Colombia has its own board of directors and corporate officers, distinct from those of Parex Canada. The purchase price was $40 million. Nabors and Parex Colombia entered into a confidentiality agreement after which Nabors gave Parex Colombia access to the data room. The confidentiality agreement included a Texas choice of law clause, but Parex Colombia requested that it be changed to New York instead.

Nabors then began entertaining multiple bids for the shares, and the purchase prices went higher and higher. [3] Although Parex Colombia was the named bidder, the bidding process was orchestrated by Parex Canada's executives. During the process, Parex Canada's executives exchanged numerous emails, calls, and voicemails with their Nabors counterparts. The Parex Canada executives knew that the Nabors executives worked in Texas.

_____

[3] Parex Colombia upped its bid price sequentially from $40 million, to $50 million, to $55 million, to $75 million. Meanwhile ERG increased its offers from $30 million, to $39 million, to $45 million.

Eventually, on March 9, 2012, Nabors arranged for its Bermudian subsidiary, Nabors Global Holdings II, Limited (Nabors Global), to enter into a share purchase agreement with ERG (ERG SPA). Under the terms of the agreement, ERG agreed to pay $45 million for the shares, with the deal set to close at 9 a.m. on March 15. ERG provided $3 million to be held in escrow. Nabors did not make Ramshorn a party to the ERG SPA, but it continued to provide ERG with diligence materials. On the day the ERG SPA was executed, Nabors emailed Wirzba to tell him that it had found another purchaser, but did not name ERG or expressly mention the ERG SPA. Nonetheless, Nabors continued to keep its data room open for other bidders to access the diligence materials. It was after this that Parex Colombia increased its bid to $55 million. Wirzba told Parex Canada that "if there is a hiccup in closing . . . you'll be the first to know." After this, Parex Canada and Nabors remained in contact concerning seismic data relating to the Ramshorn properties.

ERG and Nabors Global failed to close their deal on time. Pursuant to Wirzba's assurances that "[they'd] be the first to know" if the deal fell through, Parex Canada executives thereafter inquired as to the status of the shares, interested—as they had been for a few years—in acquiring Colombian oil and gas assets. This is when Parex Colombia again increased its bid, this time to $75 million. On March 16, 2012, however, ERG and Nabors Global agreed to extend their closing date by 72 hours. Nabors informed Parex Canada that it was working out an extension to the closing date, and included a draft of a proposed share purchase agreement with Parex Colombia in this communication.

But the second attempt to close failed as well. During the final diligence phase, ERG allegedly learned that Ramshorn had made financial misrepresentations about the nature of its ownership in the Jag-A block. As a result, the deal failed to close for a second time. Nabors notified

7

a Parex Canada executive that its deal had failed, and so Parex Colombia renewed its $75 million offer, and negotiations began.

ERG filed this suit in Texas seeking specific performance of the ERG SPA, and alleging tortious interference with contract against Nabors Global and Parex Canada. ERG also sought a temporary restraining order that would bar the sale of the Ramshorn shares. The trial court denied the request, and so ERG filed suit in Bermuda. The Bermudian court temporarily enjoined the sale of the shares while Nabors was not yet before the court, but lifted the restraining order after Nabors appeared.

The parties dispute when exactly Parex Canada's executives came to know about the ERG SPA. Parex Canada claims this occurred only at the point when it was sued in Texas. However, ERG contends that Nabors' email to Wirzba, sent after the ERG SPA was signed, conveyed the existence of the contract because the email used the word "deal."

In any event, Parex Canada arranged for Parex Barbados to wholly own a new Bermudian entity that was created in order to acquire the shares: Parex Bermuda. On April 12, 2012, the same day on which Parex Bermuda was created, Nabors Global and Parex Bermuda duly executed a share purchase agreement (Parex Bermuda SPA). The agreement was signed in Bermuda by Bermudian residents using funds located in Bermuda. Parex Canada acted as guarantor for the amount that Parex Bermuda was to pay. The Parex Bermuda SPA and the guarantee both contained New York forum selection and choice of law clauses.

ERG subsequently sued Parex Bermuda for tortious interference with contract, and also sued Ramshorn for fraud. Parex Canada, Parex Bermuda, and Ramshorn filed special appearances contesting the trial court's jurisdiction over them.

8

The trial court concluded that it had personal jurisdiction over Parex Canada and Ramshorn, but not over Parex Bermuda. The court of appeals reversed as to Parex Canada, noting that it is undisputed that Smith initiated contact with RBC, but sustained the trial court's judgment with respect to Parex Bermuda and Ramshorn.

Both ERG and Ramshorn now appeal to this Court for reversal. ERG contends that Texas courts have specific jurisdiction over Parex Canada and Parex Bermuda. Ramshorn, meanwhile, argues that Texas courts have no jurisdiction over it.

The court of appeals got it right. Texas courts have jurisdiction over Ramshorn, but not over Parex Canada and Parex Bermuda.

## II. The Constitutional Contours of Personal Jurisdiction in Texas

The jurisdictional issue in this case presents a question of law, and we review a trial court's decision on special appearances *de novo*.[4] The plaintiff bears the initial burden of pleading allegations that suffice to permit a court's exercise of personal jurisdiction over the nonresident defendant.[5] Once the plaintiff has met this burden, the defendant then assumes the burden of negating all potential bases for personal jurisdiction that exist in the plaintiff's pleadings.[6]

The exercise of personal jurisdiction in Texas state courts turns on both federal and state law. Courts have personal jurisdiction over a defendant when two criteria are satisfied: (1) the Texas long arm statute must grant jurisdiction;[7] and (2) the exercise of jurisdiction must comport

---

[4] *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 805–06 (Tex. 2002).

[5] *Retamco Operation, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 337 (Tex. 2009).

[6] *Id.*; *see also BMC Software Belgium, N.V. v. Marchland*, 83 S.W.3d 789, 793 (Tex. 2002).

[7] *See, e.g.*, *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007).

9

with federal and state constitutional guarantees of due process.[8] The Texas long arm statute provides for personal jurisdiction that extends to the limits of the United States Constitution, and so federal due process requirements shape the contours of Texas courts' jurisdictional reach.[9]

"The Due Process Clause of the Fourteenth Amendment constrains a [s]tate's authority to bind a nonresident defendant to a judgment of its courts."[10] Under the jurisprudential lodestar for personal jurisdiction, *International Shoe Company v. Washington*,[11] whether a trial court's exercise of jurisdiction is consistent with due process requirements turns on two requirements: (1) the defendant must have established minimum contacts with the forum state; and (2) the assertion of jurisdiction cannot offend traditional notions of fair play and substantial justice.[12] As relevant to our analysis in this case, sufficient minimum contacts exist when the nonresident defendant "purposefully avails itself of the privilege of conducting activities within the forum [s]tate, thus invoking the benefits and protections of its laws."[13] The nub of the purposeful availment analysis is whether a nonresident defendant's conduct in and connection with Texas are such that it could

---

[8] *Id.*

[9] *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991).

[10] *Walden v. Fiore*, 134 S.Ct. 1115, 1121 (2014).

[11] *Int'l Shoe Co. v. Washington,* 326 U.S. 310 (1945).

[12] *Id.* at 316 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940)); *BMC Software Belgium, N.V. v. Marchland*, 83 S.W.3d 789, 795 (Tex. 2002)).

[13] *Hanson v. Denkla*, 357 U.S. 235, 253 (1958) (citations omitted); *see also Montcrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d at 150 (quoting *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 338 (Tex. 2009)).

reasonably anticipate being haled into court here. Purposeful availment involves contacts that the defendant "purposefully directed" into the forum state.[14]

*International Shoe* provides two strains of personal jurisdiction: specific and general. Because both strains are at issue in this case, we provide an overview of the governing jurisprudence as to each.

### A. Specific Jurisdiction: Contacts Out of Which the Cause of Action Arises

The first type of personal jurisdiction is specific jurisdiction, which is based on whether the defendant's activities in the forum state themselves "give rise to the liabilities sued on."[15] Broadly stated, specific jurisdiction exists when the plaintiff's claims "arise out of" or are "related to" the defendant's contact with the forum."[16]

In *Shaffer v. Heitner*,[17] and on several occasions since, the United States Supreme Court has emphasized that the *defendant's* relationship, not the *plaintiff's* relationship, with the forum state is the proper focus of the specific jurisdiction analysis; that is, courts must consider the relationship between the defendant, the forum state, and the litigation.[18] As we explained in *Michiana Easy Livin' Country, Inc. v. Holten*,[19] there are three features of the "purposeful

---

[14] *Guardian Royal*, 815 S.W.2d at 228.

[15] *Int'l Shoe*, 326 U.S. at 317.

[16] *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 nn.8, 9 (1984); *see also Michiana*, 168 S.W.3d at 795.

[17] 433 U.S. 186 (1977).

[18] *Id*. at 204; *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984); *Walden v. Fiore*, 134 S.Ct. 1115, 1121 (2014).

[19] 168 S.W.3d 777 (Tex. 2005).

availment" inquiry as applied to specific personal jurisdiction:[20] (1) the relevant contacts are those of the defendant, and the unilateral activity of another person or a third party is not pertinent;[21] (2) the contacts that establish purposeful availment must be purposeful rather than random, fortuitous, isolated, or attenuated;[22] and (3) the defendant must seek some benefit, advantage, or profit by "availing" itself of the jurisdiction.[23] In the same vein, the "minimum-contacts analysis is focused on the quality and nature of the defendant's contacts, rather than their number."[24] Thus, "the mere fact that [a defendant's] conduct affected plaintiffs with connections to the forum [s]tate does not suffice to authorize jurisdiction."[25] The happenstance of a plaintiff's connection to Texas, then, will not alone suffice to confer specific jurisdiction over a defendant who merely deals with a Texas resident during the course of some unrelated endeavor. As a result, a defendant may structure its transactions in such a way as "neither to profit from the forum's laws nor subject itself to jurisdiction" there, which we have termed "purposeful[] avoid[ance]."[26]

Applying these principles, the Supreme Court has held that where a publisher contemplates a forum state as the locus of its printed material and any defamatory harm it causes—seeking to profit from extensively circulating several million copies of its magazine there—there is specific

---

[20] *Id*. at 785.

[21] *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985).

[22] *Id*.; *Keeton*, 465 U.S. at 774.

[23] *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 785 (Tex. 2005) (citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559 (1980)).

[24] *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 339 (Tex. 2009).

[25] *Walden v. Fiore*, 134 S.Ct. 1115, 1126 (2014).

[26] *Michiana*, 168 S.W.3d at 785 (citing *Burger King*, 471 U.S. at 472).

jurisdiction.[27] This was the case in *Calder*, where the fallout from allegedly defamatory statements involved was tied to the state in which the magazine had its largest circulation.[28] Similarly, where a defendant publisher circulates tens of thousands of copies of its magazine in a particular state, the plaintiff's *lack* of residence in that state is insufficient to defeat jurisdiction over the defendant in a defamation suit.[29] The Supreme Court emphasized this point in *Keeton*, holding that the magazine publisher could be haled into court in a state where it looked to profit from distributing large numbers of its magazine, the content of which harmed a nonresident plaintiff's reputation.[30] In other words, where the defendant has "continuously and deliberately exploited the [forum state's] *market*," specific jurisdiction exists.[31]

Outside of the defamation context, we held in *Michiana* that where a buyer reaches out to a foreign seller that does not do business in Texas, and fully agrees to resolve all disputes arising out of the agreement in a different state, the mere fact that the buyer brings the allegedly problematic product back to Texas is insufficient to confer specific jurisdiction over the seller in Texas.[32] The Court applied the three principles—that the defendant's contacts are the ones that matter, that contacts must be purposeful, and not random, isolated, or fortuitous, and that the defendant must seek some benefit, advantage, or profit by availing itself of the jurisdiction—in so

---

[27] *Calder v. Jones*, 465 U.S. 783, 785–86 (1984).

[28] *Id.*

[29] *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984).

[30] *Id.* at 776–77.

[31] *Id.* at 781 (emphasis added).

[32] *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 781–84 (Tex. 2005).

holding.[33] The Court also found unpersuasive the argument that the seller had somehow "directed" a tort into Texas by communicating on the phone with a Texas resident.[34]

As it turns out, we interpreted *Calder* the same way the Supreme Court recently did in *Walden*: Mere knowledge that the "brunt" of the alleged harm would be felt—or have effects—in the forum state is insufficient to confer specific jurisdiction.[35] In *Calder*, the circulation of the defendant's article was enough to create a substantial "presence" in the forum state.[36] The seller in *Michiana*, like the law enforcement officer in *Walden*, had no no such link to Texas.[37] The *Michiana* court thus expressly rejected the "directed-a-tort" theory from the jurisprudence surrounding specific jurisdiction.[38] Even if a nonresident defendant *knows* that the effects of its actions will be felt by a resident plaintiff, that knowledge alone is insufficient to confer personal jurisdiction over the nonresident. Indeed, in *Walden*, Justice Thomas made a similar point for a unanimous Court:

> [T]he Court of Appeals looked to [the defendant officer's] knowledge of [the plaintiff gamblers'] strong forum connections. In the court's view, that knowledge, combined with its conclusion that [the gamblers] suffered foreseeable harm in Nevada, satisfied the "minimum contacts" inquiry. This approach to the "minimum contacts" analysis impermissibly allows a plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis. [The officer's] actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his

---

[33] *Id.* at 785.

[34] *Id.* at 788.

[35] *See Walden v. Fiore*, 134 S.Ct. 1115, 1123 (2014); *cf. Michiana*, 168 S.W.3d at 788 (rejecting the proposition that "[i]f a tortfeasor knows that the brunt of the injury will be felt by a particular resident in the forum state, he must reasonably anticipate being haled into court there to answer for his actions").

[36] *Walden*, 134 S.Ct. at 1121.

[37] *Michiana, Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 789 (Tex. 2005); *Walden*, 134 S.Ct. at 1124.

[38] *Michiana*, 168 S.W.3d at 789–90.

14

conduct at plaintiffs whom he knew had Nevada connections. Such reasoning improperly attributes a plaintiff's forum connections to the defendant and makes those connections decisive in the jurisdictional analysis . . . . Relying on *Calder,* [the gamblers] emphasize that they suffered the "injury" caused by [the officer's] allegedly tortious conduct (*i.e.*, the delayed return of their gambling funds) while they were residing in the forum. This emphasis is likewise misplaced.[39]

For the same reasons, we held that a Utah tour operator, about which a Texan learned via word of mouth from a Texan third party, cannot be haled into Texas court on the basis of just *alleging* the tour operator's liability for a death that occurred in Arizona.[40] The *Moki Mac* Court reviewed various options for analyzing the relatedness between a nonresident's contacts and the litigation itself.[41] We considered "but-for" relatedness and criticized that analysis as being "too broad and conceptually unlimited in scope."[42] A proximate cause standard on the other hand presented "too narrow an inquiry."[43] A sliding scale that involved examining the relationship between forum contacts and the litigation was problematic because it severs the archetypal framework of there being two distinct kinds of personal jurisdiction, specific and general.[44] In the end, we adopted the requirement that we laid out in *Guardian Royal*: "[F]or a nonresident defendant's forum contacts to support an exercise of specific jurisdiction, there must be a

---

[39] *Walden*, 134 S.Ct. at 1124-25 (citations omitted).

[40] *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 588 (Tex. 2007). The dissent relies on this defunct theory, as we note, making the validity of jurisdiction turn on the merits of a tortious interference claim.

[41] *Id*. at 580–585.

[42] *Id*. at 585.

[43] *Id*.

[44] *Id*.

substantial connection between those contacts and the operative facts of the litigation."[45] Therefore, because in *Moki Mac* the tour operator's advertising brochures and release, which it sent to Texas, were not substantially connected to the operative facts of the litigation—alleged events which occurred during the Arizona trip—the Texas court did not have specific jurisdiction over the tour operator.[46] The United States Supreme Court has since clarified that the due process constraints on specific jurisdiction do indeed require this kind of "*substantial* connection," a concept that the Court emphasized in *Walden*.[47]

Specific jurisdiction, in short, does not turn on where a plaintiff happens to be, and does not exist where the defendant's contacts with the forum state are not substantially connected to the alleged operative facts of the case. There is no debate on these points, as the Supreme Court has "consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State."[48]

The dissent broadly states that "if a nonresident defendant's purposeful activities within Texas are the crux of the tort claim, Texas courts have jurisdiction" over that tort claim.[49] But the Supreme Court has made clear that the nature of a plaintiff's claim does not by itself control

---

[45] *Moki Mac*, 221 S.W.3d at 588 (citing *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 229–33 (Tex. 1991)).

[46] *Id*. at 585.

[47] *Walden v. Fiore*, 134 S.Ct. 1115, 1121 (2014) ("[f]or a State to exercise jurisdiction consistent with due process, the defendant's suit-related conduct must create a substantial connection with the forum State") (emphasis added).

[48] *Id*. at 1122.

[49] *Post* at ___. *See also* "[i]mportantly, Parex Canada's negotiation and bidding activities in Texas . . . form the basis of ERG's tortious-interference claims." *Id*.

16

whether courts have specific jurisdiction over the defendants against which the claims are levied. In *Calder*, the Court emphasized the magazine's "large circulation" in California,"[50] and noted that "[a]bout 600,000 . . . copies, almost twice the level of the next highest State, [were] sold in California."[51] The Court also observed that the article in question was "drawn from California sources, and [that] the brunt of the harm, in terms both of . . . emotional distress and the injury to . . . professional reputation, was suffered in California."[52] Indeed, "in sum, California [was] the focal point both of the story and of the harm suffered."[53] As we noted in *Michiana*, we must not confuse "the roles of judge and jury by equating the jurisdictional inquiry with the underlying merits."[54] *Calder* emphasized that "[to] reintroduce those concerns at the jurisdictional stage would be a form of double counting."[55] And there, the "crux of *Calder* was that the reputation-based 'effects' of the alleged libel connected the defendants to California, not just to the plaintiff."[56] The crux was not the nature of the claim. Undaunted, the dissent focuses on the merits of the underlying cause of action in its jurisdictional test and ultimately concludes that merely stating a claim that at its "crux" implicates Texas is sufficient to confer jurisdiction. We have rejected this jurisdictional theory.[57] As we made clear in *Michiana*:

---

[50] 465 U.S. 783, 784 (1984).

[51] *Id*. at 785.

[52] *Id*. at 788–89.

[53] *Id*. at 789.

[54] *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 790 (Tex. 2005).

[55] *Calder v. Jones*, 465 U.S. 783. 790 (1984).

[56] *Walden v. Fiore*, 134 S.Ct. 1115, 1123–24 (2014).

[57] *Michiana*, 168 S.W.3d at 790.

Business contacts are generally a matter of physical fact, while tort liability . . . turns on what the parties thought, said, or intended. Far better that judges should limit their jurisdictional decisions to the former rather than involving themselves in trying the latter.[58]

What we said then remains good law and binds us today.

## B. General Jurisdiction: Contacts So Continuous and Systematic that a Defendant is "Essentially at Home"

*International Shoe* also contemplates suits where a defendant's "continuous . . . operations within a state [are] thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities."[59] This is general jurisdiction and has been less frequently discussed, both by the Supreme Court and this Court, than its specific counterpart.[60]

One of the earliest Supreme Court cases, *Perkins v. Benguet Consolidated Mining Company*,[61] involved a Philippines corporate defendant whose president moved to Ohio after Japan invaded the Philippines during World War II.[62] The Court held that general jurisdiction over Benguet was proper in Perkins' suit, even though no claims related to any of Benguet's Ohio conduct.[63] The Supreme Court critically relied on Benguet's president's maintenance of the

---

[58] *Id*.

[59] *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 318 (1945).

[60] *See, e.g.*, Mary Twitchell, *The Myth of General Jurisdiction*, 101 HARV. L. REV. 610, 628 (1988) (noting that "specific jurisdiction has become the centerpiece of modern jurisdiction theory, while general jurisdiction plays a reduced role").

[61] 342 U.S. 437 (1952).

[62] *Id*. at 448.

[63] *Id*.

18

company's files in Ohio and oversight of the business from that state,[64] which led to the Court's later clarification that the touchstone of the *Perkins* analysis was that Benguet's principal place of business was in Ohio.[65]

A subsequent case, *Helicopteros v. Hall*,[66] concerned general jurisdiction over a Colombian corporation that went to Houston for a meeting, drew money from a New York bank through Texas, bought helicopter-related equipment from a Texan company, and sent personnel to be trained in Texas.[67] As in *Perkins*, the claims in *Helicopteros* were unrelated to the corporation's contacts with Texas; the claims instead related to a helicopter accident in Peru.[68] The Supreme Court held that corporation's contacts, even though some were periodically made, were insufficient to confer general jurisdiction over it.[69]

With these cases as a backdrop, we are mindful of the critical distinction between specific and general jurisdiction. Although the likelihood of specific jurisdiction may increase in step with any substantial connection between the asserted claims and the forum state, the ties between the litigation itself and the forum state are irrelevant to the question of whether general jurisdiction exists. Rather, general jurisdiction relies on the defendant itself being tied up—almost entangled in a web—with the forum state.[70] Thus, subsidiaries that are totally unrelated to the forum state,

---

[64] *Id.*

[65] *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 n.11 (1984).

[66] 466 U.S. 408 (1984).

[67] *Id.* at 416.

[68] *Id.* at 410.

[69] *Id.* at 418.

[70] *See, e.g.*, *International Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945).

its economy, and its laws, cannot be haled into that state's courts merely by virtue of their ownership, and their ownership alone.[71]

And more recent Supreme Court cases have clarified that the general jurisdiction analysis entails a high bar. Indeed, a court has general jurisdiction over a defendant only if its "affiliations with the [s]tate are so continuous and systematic as to render it *essentially at home* in the forum [s]tate."[72] Continuous and systematic contacts that fail to rise to this relatively high level are insufficient to confer general jurisdiction over a nonresident defendant.[73] Thus, when a nonresident corporation owns an in-state subsidiary, this ownership is not *ipso facto* sufficient to confer jurisdiction over the nonresident owner itself.[74] Courts do not have general jurisdiction over corporate defendants that are neither incorporated in the forum state nor have their principal place of business there, absent some relatively substantial contacts with the forum state.[75]

\* \* \*

Having laid out the pertinent law, we now apply it to the facts of this case.

---

[71] *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2850 (U.S. 2011).

[72] *Daimler AG v. Bauman*, 134 S.Ct. 746, 761 (2014) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2851 (U.S. 2011)) (emphasis added).

[73] *Id.*

[74] *Id.* at 759.

[75] *Id.* at 761–62.

20

### III. Application of Personal Jurisdiction Principles

### A. No General Jurisdiction over Parex Canada

We begin with general jurisdiction over Parex Canada and deal with it summarily, given the relatively extreme lack of connection between Parex Canada and Texas. It is plain, as the court of appeals held, that Texas courts do not have general jurisdiction over Parex Canada.

*Daimler* makes clear that general jurisdiction is only present when a defendant not only has continuous and systematic contacts with the forum state, but also has these kinds of contacts to such an extent that they render it essentially at home in that state.[76] The general jurisdiction inquiry, as applied to a corporate defendant, is not limited to simply whether its principal place of business is the forum state, or whether the forum state is its state of incorporation.[77] That is, continuous and systematic contacts, taken alone, are not enough to confer general jurisdiction over a defendant—such a formulation of the test is "unacceptably grasping."[78]

Here, we take heed of the trial court's finding that Parex Canada has no bank accounts, offices, property, employees, or agents in Texas. It does not sell products in Texas, nor does it pay taxes here. Aside from a few meetings concerning transactions unrelated to this case, Parex Canada has not interacted with Texas aside from in its dealings with Nabors. Its contacts with Texas are not even continuous and systematic, let alone sufficient to deem it essentially at home in Texas. There is no general jurisdiction over Parex Canada, and we affirm the court of appeals on this issue.

---

[76] *Id.* at 760.

[77] *Daimler AG v. Bauman*, 134 S.Ct. 746, 760 (2014).

[78] *Id.*

## B. No Specific Jurisdiction over Parex Canada

We turn next to whether there is specific jurisdiction over Parex Canada. As relevant here, Jordan Smith, a Nabors employee, contacted RBC looking to sell off its shares related to oil and gas assets in Colombia. Parex Canada—striving to expand its Colombian portfolio—only became involved with Nabors after this solicitation.[79] Parex Canada appears to have known that Nabors had operations in Texas, but it did not specifically seek out a Texas seller or Texas assets, let alone attempting to meddle with a contract governed by Texas law or develop a Texas business. In light of Nabors' coincidental presence in Texas, the fortuitous and attenuated nature of Parex Canada's contacts with Texas, and Parex Canada's lack of any desire to launch or maintain operations in Texas, we hold that the trial court lacked specific jurisdiction over Parex Canada.

The fact that Parex Canada knew that Nabors had operations in Houston is, taken alone, insufficient to confer specific jurisdiction. True, the trial court did find that Parex Canada employees arranged discussions with their Nabors counterparts that were to take place during calls described as "10am Houston or 10:30 Houston" time. Further, Parex Canada's executives knew that the virtual data room was housed in a Houston server, received emails from Nabors employees that contained their Texas addresses, and sent letters of intent to Nabors at a Houston address. ERG, of whom Parex Canada did not know until relatively late in its negotiations, turned out to be incorporated and headquartered in Texas.

---

[79] The dissent attempts to refute the Court's position by noting that Parex Canada communicated with RBC. We cannot see how a Canadian company's communication with a Canadian bank's Calgary-based employee regarding the purchase of some Colombian oil and gas assets can provide the basis for specific jurisdiction over the Canadian firm in this State.

But the mere fact that Nabors and ERG were both located in Texas and negotiated a multi-million-dollar acquisition at hand cannot be a decisive factor in the analysis of whether specific jurisdiction exists as to nonresident Parex Canada. As the Supreme Court noted in *Calder*, the "mere fact that the [publisher] could 'foresee' that the article [would] be circulated and have an effect in California [was] not sufficient for an assertion of jurisdiction."[80] Rather, in that case "the defendants' intentional tort actually occurred *in* California."[81]

In the same vein, jurisdiction is proper when a defendant has "envisioned continuing and wide-reaching contacts" in the forum state.[82] Thus, it is important to note that Parex Canada did not seek to launch operations in Texas or reap the benefits of the Texas economy.[83] It was, instead, on the hunt for Colombian assets, and Ramshorn—a Bermuda company—owned some. ERG claims that "Parex Canada's contacts with Texas . . . began on Friday, March 9, 2012—the date on which Nabors and ERG entered into the $45 million ERG SPA." But Nabors' unilateral decision to enter into this agreement was completely out of Parex Canada's control. A plaintiff's (ERG's) decision to enter into a contract with a Texas company cannot provide the basis for specific jurisdiction over the defendant, (Parex Canada)—the plaintiff's engagement with a Texan party

---

[80] *Calder v. Jones*, 465 U.S. 783, 789 (1984) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 295 (1980)).

[81] *Walden v. Fiore*, 134 S.Ct. 1115, 1124 (2014).

[82] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985).

[83] *See, e.g.*, *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (2005) (highlighting that "a nonresident that directs marketing efforts to Texas in the hope of soliciting sales is subject to suit here in disputes arising from that business," but that without the intention to profit from the vibrant Texan economy, specific jurisdiction does not properly vest).

cannot alone provide a basis for jurisdiction over a foreign company that that wants to buy foreign assets.

Parex Canada did—as the dissent states—have many interactions with Nabors. The dissent implies that we make light of these communications because they did not occur in-person, but were rather made electronically via emails and calls.[84] Indeed, the dissent contends that the Court disregards "the realities of modern communications"[85] and "the realities of modern communication of complex business negotiations."[86] We do not, however, make such a distinction.[87] We agree with the dissent—Parex Canada's executives discussed the deal on multiple occasions with people whom they knew worked in Nabors' Texas operation. But that fact alone simply does not decide this case. As noted above, the "minimum-contacts analysis is focused on the quality and nature of the defendant's contacts, rather than their number."[88] It is natural that a transaction which involves the transfer of rights to an oil field will involve more extensive discourse than the sale of a motor vehicle that was involved in *Michiana*.

But, quantity aside, the quality and nature of the communications fail to establish purposeful availment. Discussions that focused on acquiring some non-Texan assets are a far cry from purposeful availment of Texas's jurisdiction—the Nabors employees involved could, quite literally, have been based anywhere in the world, and Parex Canada would presumably have

---

[84] *Post* at ___.

[85] *Id.*

[86] *Id.*

[87] Indeed, nowhere in this opinion do we highlight a difference between in-person and electronic communications.

[88] *Retamco Operating, Inc. v. Republic Drilling Co.*, 278 S.W.3d 333, 339 (Tex. 2009).

interacted with it in the same way as they did with its employees here. Parex Canada did not purposefully avail itself of the benefits, privileges, or profits of engaging with Texas. Rather, the mere coincidence of Nabor's presence here—completely out of Parex Canada's control—means that the trial court lacked specific jurisdiction.

Our caselaw confirms as much. We held in *Retamco* that even when a defendant does not enter Texas, its acceptance of Texas interests that are allegedly implicated in fraud is sufficient to confer specific jurisdiction, in part because such acceptance creates an ongoing relationship with Texas.[89] Similarly, in *Moncrief* we noted that the defendants were interested in establishing a long-term joint venture in Texas, and that fact was critical to our holding that they had purposeful and substantial contacts with Texas.[90] Similarly, we recognized in *Moki Mac* that when a defendant has aimed to "get extensive business in or from" Texas, it is more likely to have purposefully availed itself of the Lone Star State's jurisdiction.[91] As the Supreme Court held in *Calder*, jurisdiction was present when "intentional, and allegedly tortious conduct . . . [is] *expressly aimed* at California."[92] There, as the Court went out of its way to state, the defendant publisher knew that the brunt of the injury would be felt where the magazine had "its largest circulation"[93]—the publisher sought to sell its salacious story to readers that lived in the state in which it was subsequently sued.

---

[89] *Id.*

[90] *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 153–54 (Tex. 2013).

[91] *Moki Mac River Expeditions v. Drugg*, 211 S.W.3d 568, 578 (Tex. 2007).

[92] *Calder v Jones*, 465 U.S. 783, 789 (1984) (emphasis added).

[93] *Id.* at 790.

Not so here. Parex Canada displayed no interest in developing a Texas enterprise, nor did it specifically seek a Texas seller. To the contrary, Parex Canada appears to have purposefully avoided Texas. It structured the transaction so as to neither benefit from Texas law nor subject itself to Texas courts' jurisdiction. Moreover, the Parex Canada guarantee contained a New York forum selection clause, and so did the Parex Bermuda SPA. Those agreements also contained New York choice of law clauses. As we said in *Michiana*, "insertion of a clause designating a foreign forum suggests that no local availment was intended."[94] And even more probatively, Parex Canada arranged for a Bermudian subsidiary to be the sole owner of the shares relating to Colombian assets. We are thus hard put to discern purposeful availment of Texas law or how Parex Canada "would have conducted its activities any differently if Texas had no law at all."[95]

The dissent states that if the assets were located in Midland, rather than Colombia, it would not alter the jurisdictional analysis.[96] We struggle to understand this logic. If the assets were located in Midland, Parex Canada would have been seeking to buy Texan operations and develop a link with the Texas market from which it could profit. Those facts are materially different from the ones here. Parex Canada wanted to profit from a Colombian, not Texan, oil business—the two are certainly not interchangeable when it comes to whether jurisdiction is proper in Texas courts.

Parex Canada also did not initiate the interactions that it eventually had with Nabors. It was Nabors who solicited RBC for its investment banking services in order to find potential buyers of

---

[94] *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 792 (Tex. 2005). Indeed, as the dissent itself notes, the agreement that was to be the starting point for negotiations contained a New York choice of law provision and specified Bermuda as the closing location.

[95] *Id.* at 787.

[96] *Post* at ___.

its shares. We view Parex Canada's emails and calls to Nabors in light of the fact that Nabors reached out to RBC, which in turn notified Parex Canada of the opportunity to acquire shares regarding Colombian assets—assets owned by Ramshorn, a Bermudian company. Parex Canada did not find out that ERG was a potential counterparty to Nabors Global for purchase of the relevant assets until a relatively late stage in the deal. Thus, Parex Canada did not have a "substantial connection" to the operative facts of the litigation.

ERG though claims that Parex Canada through its dealings with Nabors attempted to harm ERG in Texas, and wanted to induce breach of the ERG SPA. The merits of these claims, as we note above, are not at issue here. ERG's position is foreclosed by *Michiana*—the alleged direction of a tort into Texas is not a valid basis for specific jurisdiction. As we have highlighted in both *Michiana* and *Moncrief*, and as the Supreme Court emphasized in *Walden*, the proper focus is on the quality of the defendant's contacts with the forum, as opposed to the residence of the plaintiff.

Indeed in *Moncrief*, the defendants allegedly urged, in California, a Californian entity to breach its agreement with a Texas-based plaintiff—there was even an express allusion to the plaintiff that would eventually sue.[97] Yet we held that this sort of nonresident behavior by a nonresident defendant does not rise to the level of creating a substantial connection to the Texas forum.[98] Parex Canada merely sought to purchase assets in Colombia from a Bermudian entity, which would have the corollary of making it impossible for a Texas company to simultaneously

---

[97] *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 156–57 (Tex. 2013).

[98] *Id*. at 158.

27

own them. Such behavior is insufficient to confer upon Texas courts specific jurisdiction over Parex Canada.

In concluding that there is specific jurisdiction over Parex Canada, the dissent focuses on the number of emails, calls, and voicemails that the Canadian executives exchanged with people they *knew* worked for Nabors' Texas operation.[99] But in *Walden* the Supreme Court rejected the idea that simply because a defendant knows the effects of his actions will affect someone who lives in a state, there is specific jurisdiction over the defendant in that state.[100] Rather, the question before us is whether Parex Canada's communications with Texas, however voluminous, constitute purposeful availment. We hold that they do not. This case is not about the volume of communications between Parex Canada and Nabors. What instead controls is the fact that the Colombian oil and gas assets that Parex Canada wanted to buy happened to be owned by a Bermudian company which had some Texas operations. It is hard to fathom a more "fortuitous" connection to Texas than the mere accident of a Bermudian firm, who turned out to own such Colombian assets, having some Houstonian executives involved in the sale.

We therefore affirm the court of appeals on this issue. The trial court erred in holding that it had specific jurisdiction over Parex Canada.

## C. Specific Jurisdiction over Ramshorn

We agree with the trial court, the court of appeals, and the dissent, that the trial court had specific jurisdiction over Ramshorn. Ramshorn is a Bermuda corporation solely owned by Nabors,

---

[99] *Post* at ___.

[100] The officer in that case seized cash from gamblers on their return trip to Nevada, and he knew that his allegedly false affidavit would affect people who lived in Nevada. *Walden v. Fiore*, 134 S.Ct. 1115, 1124–25 (2014).

a Bermuda company that directs Ramshorn's actions from Houston. A Nabors executive, Jordan Smith, is also president of Ramshorn Investments, Inc. (Ramshorn Investments) which is a company separate from Ramshorn. Smith's responsibilities included supervising Nabors' mergers, acquisitions, and divestitures. One of ERG's allegations is that Smith acted and held himself out as Ramshorn's president, and in doing so made fraudulent representations in Houston about the Ramshorn assets that he was trying to sell to ERG. We affirm the denial of Ramshorn's special appearance, because Smith had actual and apparent authority to sell the Ramshorn shares, and because Smith actively negotiated their sale in Texas.

The trial court found that Smith acted as Ramshorn's president, even signing the company's drilling contracts. Ramshorn's general manager, Arango, stated that she believed Smith to be the president of Ramshorn as well as of Ramshorn Investments. Smith was the executive who signed off on "authorizations for expenditure" (ATEs), which Arango routinely sent him before Ramshorn spent large sums of money during the course of operations.

Moreover, Ramshorn's argument that the ATEs were simply creatures of Nabors' and its subsidiaries' accounting systems is unpersuasive. Rather, Arango referred to Smith as Ramshorn's president in draft materials that she sent him, and he merely forwarded these to Dunne without changing that representation. Such entanglement between Ramshorn and Nabors supports the trial court's holding that it had specific jurisdiction over claims alleging misrepresentation by the Nabors executive who had the actual power to control whether Nabors sells the Ramshorn shares—claims which arise out of the exercise of that power. This sort of close connection between Ramshorn and Nabors is not random, fortuitous, or attenuated—rather it was all part of a general plan to sell the Ramshorn shares via talks in Texas, and thus use the Texas forum to make money.

Ramshorn contends that Smith was not its employee and did not intend for him to have authority to represent it in the Texas negotiations. However, Ramshorn allowed Smith to hold himself out as its president for a period of years, and its general manager Arango believed him to be her boss. Nabors had portrayed Smith as Ramshorn's president during the run-up to the Texas meetings, and Ramshorn consistently held him out as having the authority to sell its Class A shares. Nor is it persuasive that during the meetings Smith suddenly stopped conveying the sense that he was in charge of Ramshorn. Although the ERG SPA does not list Smith as a Ramshorn officer, the organizational chart which was provided to ERG during its visit to Colombia referred to Smith as Ramshorn's president. Ramshorn had acquiesced to this arrangement in part through its being almost totally controlled by Nabors.

We thus affirm the court of appeals and hold that the trial court had specific jurisdiction over Ramshorn because its actual and apparent president purposefully availed the company of the Texas jurisdiction by negotiating at relative length in Texas for sale of its shares to a Texas buyer. ERG's claims directly arise out of this contact with the Texas forum, because they allege that Ramshorn made various misrepresentations during these Texas dealings.

### D. No General Jurisdiction over Ramshorn

In light of the Supreme Court's guidance in *Goodyear* and *Daimler*, we do not agree with ERG that the trial court had general jurisdiction over Ramshorn. As we note above, where a corporation does not have a principal place of business in Texas, is not incorporated in Texas, and

30

where it has only limited contacts with Texas, it does not have continuous and systematic contacts with Texas that rise to a level that renders it essentially at home in the Lone Star State.[101]

ERG urges that Ramshorn's operations were managed and controlled from Houston. Indeed they were. However, these contacts were not pervasive enough to establish general jurisdiction over Ramshorn.[102] According to ERG, because a Houston-based company, Shona Energy International, Limited (Shona) owned Ramshorn's Class B shares, and because Nabors owned its Class A shares, general jurisdiction exists. But although Ramshorn's entanglement with its owners is pertinent to the specific jurisdiction analysis in analyzing the degree to which it purposefully availed itself of Smith's ability to negotiate with a Texas buyer, an entity's mere ownership in the forum state is insufficient for that state to have general jurisdiction over the subsidiary defendant.[103]

To hold otherwise would be to blur "the fundamental distinction between general and specific jurisdiction that is firmly embedded in our jurisprudence."[104] As we have noted, specific jurisdiction encompasses cases which arise out of the defendant's contacts with the forum,[105] and so a trial court may have specific jurisdiction over a foreign subsidiary with respect to claims that its parent company and its agents—vested with sole ownership of a subsidiary, and thus control over the sale of its shares, and with which the subsidiary's operations are deeply entangled—

---

[101] *Daimler AG v. Bauman*, 134 S.Ct. 746, 760 (2014).

[102] *See id*. at 751.

[103] *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2856 (U.S. 2011).

[104] *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 584 (Tex. 2007); *see also Goodyear*, 131 S.Ct. at 2855 (U.S. 2011).

[105] *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414, n.8 (1984).

31

misrepresented the of its assets. However, a finding of general jurisdiction, which does not depend on the claims at hand, requires some deeper connection with the forum state than mere ownership by a local corporation. Indeed, "ties serving to bolster the exercise of specific jurisdiction do not warrant a determination that, based on those ties, the forum has general jurisdiction over a defendant."[106] Just as in *Goodyear*, where an American corporation's ownership of Luxembourgian, French, and Turkish companies was itself insufficient to confer jurisdiction over the foreign subsidiaries, we hold that Nabors' ownership of the Ramshorn shares is insufficient to give Texas courts general jurisdiction over Ramshorn.

### E. No Jurisdiction over Parex Bermuda

Finally, we address personal jurisdiction over Parex Bermuda. ERG appears to rely exclusively on its theory that jurisdiction over Parex Bermuda exists through its purported ratification of Parex Canada's contacts with Texas. However, because we hold that there is no personal jurisdiction over Parex Canada, ERG's ratification theory is inapposite. ERG's briefs have not proposed any independent basis for finding jurisdiction over Parex Bermuda, and we therefore affirm the court of appeals' judgment on this issue that no personal jurisdiction—general or specific—over Parex Bermuda exists.

---

[106] *Goodyear*, 131 S.Ct. at 2855 (emphasis in original).

### III. Conclusion

To sum up, the trial court did not have specific or general jurisdiction over Parex Canada and Parex Bermuda, but it did have specific—though not general—jurisdiction over Ramshorn.

For these reasons, we affirm the judgment of the court of appeals.

_____
Don R. Willett
Justice

**OPINION DELIVERED:** June 17, 2016