

In The
Court of Appeals
Seventh District of Texas at Amarillo

No. 07-23-00366-CV

ER SOFTWARE CANADA ULC, APPELLANT

V.

INTERDEV TECHNOLOGIES CORPORATION AND
VALSOFT CORPORATION INC., APPELLEES

On Appeal from the 200th District Court
Travis County, Texas
Trial Court No. D-1-GN-23-002713, Honorable Jessica Mangrum, Presiding

February 26, 2024

MEMORANDUM OPINION[1]

Before QUINN, C.J., and PARKER and DOSS, JJ.

Why say more when less both suffices and facilitates comprehension. Heeding that, we open in this way.

Canadian corporation A buys Canadian corporation B, which conducts no business in Texas and operates almost exclusively in Canada. Eventually, A decides to sell the

---

[1] Because this appeal was transferred from the Third Court of Appeals, we apply its precedent should it conflict with that of the Seventh Court of Appeals. TEX. R. APP. P. 41.3.

assets of B to Canadian entity C. A found C after contacting an employee of California corporation D, who happened to office in New York. Then D, who had transplanted its headquarters to Texas while maintaining offices throughout the United States, if not globally, teamed with Texas corporation E to assist in consummating the sale to C.

Negotiations ensued with all communicating electronically (e.g., telephone or email) through missives emanating to and from Canada and differing states, including Texas. Yet, never did an officer or employee of A or B set foot in Texas in furtherance of the sale. Any hesitance to travel did not so affect D or E, though. Their representatives went north to perform their due diligence of the targeted Canadian corporation and its Canadian assets. So too did D or E send their money northward from a Texas bank upon execution of the accord. And, in the contract ultimately signed, the signatories agreed that Canada's law would control the enforcement of the agreement and resolution of disputes related thereto.

Dispute did arise. Allegedly, various assets of B in Canada were not as represented. So, despite 1) being an entity created under the laws of Canada, 2) complaining of two Canadian corporations operating mainly in Canada and outside Texas, and 3) knowing Canadian law would settle the dispute, C sued A and B in Texas.

Soon followed the special appearances of A and B. Neither believed Texas could legitimately exercise personal jurisdiction over them. C disagreed. That Canadian entity viewed its Canadian cousins as having subjected themselves to Texas authority due to their interaction with "Texans," i.e., D and E. The electronic communications alluded to the purported reputation of California corporation D being headquartered in Austin, E's operation in Texas, various obligations allegedly due D and E, and monies being sent

2

from Texas were enough for the long arms of Texas to embrace A and B, in C's estimation. Yet, neither D nor E were parties to the suit. Nor were the purported side agreements with them the subject of suit.

No doubt, the words of Mr. Lovett ring true. "That's right, you're not from Texas, That's right, you're not from Texas . . . but Texas wants you anyway." Maybe agreeing that Texas wanted them anyway, the trial court nevertheless decided it could not have them. So, it granted the special appearances and dismissed the entirety of C's suit against A and B for want of personal jurisdiction.

C appealed, believing the trial court erred. Texas had "special jurisdiction" over the Canadian corporations, argued C. Although we concede that the welcoming, long arms of Texas reach far and wide, we cannot fault the trial court's decision.

*Analysis*

Our analysis begins with identifying A, B, C, D, and E. Valsoft Corporation (A) owned Interdev Technologies Corporation (B), the assets of which were bought by ER Software Canada ULC (C) with the assistance of Vista Equity Partners (D) and ESO Solutions, Inc. (E).[2] But, because referral to each entity as A, B, C, D, and E, respectively, facilitates our explanation of the circumstances, their use will be continued. With that, we turn to discussing the pertinent law and applying it to the record.

We preliminarily note that the existence of personal jurisdiction over non-residents implicates a question of law. *State v. Volkswagen Aktiengesellschaft*, 669 S.W.3d 399, 413 (Tex. 2023); *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 66 (Tex. 2016). So, we consider de novo the question. *Id.* And, in doing so, we imply all relevant facts supported

---

[2] Apparently, ER was a subsidiary of ESO, which happened to be owned by a fund Vista controlled.

3

by evidence in favor of the ruling when the trial court executed neither findings of fact nor conclusions of law, like here. *State*, 669 S.W.3d at 413 (quoting *Moncrief Oil Int'l Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 (Tex. 2013)). So too must we resolve any conflict in the evidence by upholding the trial court's determination. *Id.* (quoting *TV Azteca v. Ruiz*, 490 S.W.3d 29, 36 n.4 (Tex. 2016)).

Since the debate simply focused on specific jurisdiction, our review is limited to that mode of gaining personal jurisdiction. It exists when 1) a defendant engaged in an act or acts which purposefully avails it of the privilege of conducting activities within Texas and 2) the plaintiff's claim arises out of or relates to those contacts with the forum. *State*, 669 S.W.3d at 412-13 (quoting *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 141 S. Ct. 1017, 1024-25 (2021)). Purposeful availment is a bit of an amorphous concept. Its assessment involves a claim-by-claim analysis with an eye directed at the relationship among the defendant, the forum state, and the operative facts of the litigation. *Id.* Three considerations guide the assessment. They consist of 1) only the particular defendant's contacts with the forum, not those of another party or third person; 2) those contacts of the particular defendant being purposeful as opposed to random, fortuitous, or attenuated; and 3) the particular defendant seeking some benefit, advantage, or profit by availing itself of Texas's jurisdiction. *Id.* at 413-14 (quoting *Moncrief Oil, supra*). Unlike the quantity of contacts, their quality and nature have sway. *Id.* That said, we turn to the merits of the appeal.

First, the general foundation of C's contention rests upon the proposition that A and B knew they dealt with "Texans." Indeed, one finds a plethora of references to "Texans" throughout its briefs. To the extent one defines "Texan" as "relating to Texas or

4

its inhabitants," *Collins Dictionary*, www.collinsdictionary.com, maybe a legal fiction such as a corporation can be labeled "Texan." *See Chronister Lumber Co. v. Williams*, 116 Tex. 207, 211, 288 S.W. 402, 403 (Tex. 1926) (describing a corporation as a "legal fiction" or "artificial being without mind, soul, heart or life; it may not conceive a purpose, form or execute a plan, or do an act except through the agency of men or women"). And maybe D heeded Mr. Lovett's words when opting to move its headquarters to Austin, though it undoubtedly maintains offices in various other states, including that of its incorporation. Yet asking us to assign any weight to the status as "Texans" is tantamount to asking us to factor links with the forum into the equation. That we cannot do, according to *State*. Again, only the particular defendant's contacts with the forum are relevant, not those of another party or third person. So, the location of "Texans" D and E, who are not even parties to the suit, carries little sway.

Second, that A and B engaged in conversation with representatives of D and E located in Texas cannot be denied. However, telephonic or electronic communications are but one component of the equation; they are not *ipso facto* determinative. *See Searcy*, 496 S.W.3d at 74 (observing that electronic communication through calls and emails alone do not decide the case since the minimum contacts analysis focuses on the quality and nature of the defendant's contacts, rather than their number); *see also Old Republic Nat'l Title Ins. Co. v. Bell*, 549 S.W.3d 550, 560 (Tex. 2018) (stating that "[o]n their own, numerous telephone communications with people in Texas do not establish minimum contacts, and we have noted that changes in technology may render reliance on phone calls obsolete as proof of purposeful availment"). Moreover, as in *Searcy*, those contacts involved the acquisition of assets of a Canadian corporation conducting business

5

far outside Texas borders. As said in *Searcy*, electronically conducted "[d]iscussions that focused on acquiring some non-Texan assets are a far cry from purposeful availment of Texas's jurisdiction . . . ." *Searcy*, 496 S.W.3d at 74-75.

Third, while there may have been some physical interaction between the parties during negotiation of the deal, they occurred outside Texas. No one representing A and B came to Texas, though personnel of D and E may have gone to Canada or other states while pursuing the investment.

Fourth, concerning the aforementioned communications, they began not by contact with someone in Texas; rather, the call was placed to an employee of D headquartered in New York City. And, it happened that the employee apparently specialized in garnering Canadian business opportunities, or so indicates the evidence of record. That circumstance tends to trivialize C's argument that A and B sought out D because of the California corporation's supposed reputation for headquartering in Austin, Texas. Further trivialization occurs when we see that D ultimately agreed to receive notifications required under the agreement at its office in California.

Fifth, one cannot escape the simple fact that culmination of the deal actually resulted in C, a Canadian entity, owning B. That steers us back to *State* and its comment about maintaining the separate identity of corporations when working the jurisdiction equation. *See State*, 669 S.W.3d at 419 (observing that "parent and subsidiary corporations are presumed to be separate from one another"). We hesitate to ascribe much weight to contacts with D and E in the jurisdictional calculus when neither directs us to evidence illustrating they actually controlled the internal operations and affairs of C or otherwise fused together their identities. *See id.* (quoting *BMC Software Belg., N.V. v.*

6

*Marchand*, 83 S.W.3d 789 (Tex. 2002) (stating that "to 'ascribe one corporation's actions to another by disregarding their distinct corporate entities' or to 'fuse' the parent company and its subsidiary for jurisdictional purposes, the plaintiff[] must prove the parent controls the internal business operations and affairs of the subsidiary' to a degree 'greater than that normally associated with common ownership and directorship'")).

Sixth, the record nowhere illustrates that C's acquisition of B resulted in A or B sending products or services to or otherwise operating in Texas. *See Searcy*, 496 S.W.3d at 74 (stating that jurisdiction is proper when a defendant has envisioned continuing and wide-reaching contacts in the forum state and noting that Parex Canada did not seek to launch operations in Texas or reap benefit from the Texas economy). B, its assets, and its operations remained foreign to Texas environs.

Seventh, no one denies that payment for the transaction came from monies held in a Texas bank. Yet, C failed to cite evidence indicating it mattered to A or B whether payment was composed of assets held in Texas. Indeed, as United States legal tender is rather fungible, it is just as likely that the seller had no interest from whence the funds came, so long as they came.

Eighth, as for obligations due D and E, the latter alluded to contractual provisions supposedly requiring their performance in Texas. In doing so, however, they neglected to provide a record cite to any provision of any agreement expressly mentioning Texas as the geographic situs of performance. Instead, the citations provided first led us to an affidavit wherein the affiant mentioned execution of a service agreement for short-term or interim "back-office services." Those "back-office services" were described "as accounting, invoicing, accounts receivable, and accounts payable, for a period of time so

that the Interdev business could continue to operate as it was being integrated into ESO." Nothing was said about the services being performed or provided in Texas. Rather, it seems they were performable in Canada since they facilitated the continued operation of the Canadian corporation B in Canada. Perusing the service agreement itself confirms as much. It 1) describes the service recipient as C, the Canadian corporation acquiring B's assets, 2) contains a clause specifying that the "Agreement is governed by and will be interpreted and construed in accordance with the laws of the Province of Ontario and the federal laws of Canada applicable therein" and 3) characterizes the nature of the services to be those relevant to the interim operation of and preservation of assets belonging to B in Canada. Being interim and involving operations outside Texas hardly denotes *Searcy's* reference to the performance of continuing, wide-reaching obligations directed at or in Texas. *See e.g.*, *Epicous Adventure Travel, LLC v. Tateossian*, *Inc.*, 573 S.W.3d 375, 386 (Tex. App.—El Paso 2019, no pet.) (observing that a one-time sale with a limited-duration relationship was insufficient to establish specific jurisdiction).

As for C's reference to the indemnity provision within the asset sales agreement, the impact of that suffers from like deficiency. The clause fails to specify any place of performance, much less one in Texas. And while D and E may fall within the general ambit of indemnitees, they are but two of many within the category. Those many may well be scattered throughout Canada and the United States depending on the nature of claim. This and the possibility of D and E, as well as an unknown number of other people or entities throughout North America, being indemnitees if ever a claim is asserted is nominal evidence of performance implicating Texas hospitality. Indeed, the purported

8

link to Texas depends more on the happenstance of the indemnitee being in Texas than it does on seeking benefit from Texas.

Ninth, we cannot escape the impact of one other fact. The choice of law provision agreed to by all involved specified Canada, not Texas. Nor does the contract require disputes to be resolved in a Texas forum. Though C may want to minimize the effect of those circumstances, one would be "hard put to discern purposeful availment of Texas law" from them. *Searcy*, 496 S.W.3d at 76; *see IRA Resources, Inc. v. Griego*, 221 S.W.3d 592, 598-99 (Tex. 2007) (noting the agreement's stipulation that any disputes be governed by California law as indicating there was never an intention by defendant to avail itself of Texas law).

The trial court got it right. Upon assessing the three considerations mentioned in *State* against the record at bar, we find no purposeful availment of Texas privilege by Valsoft or Interdev. There were contacts by them with Texas. But, the quality and nature of those contacts were nominal, on balance. In effect, any link to Texas was fortuitous rather than purposeful. Like Mr. Lovett's girl from Georgia, A and B may have wondered about Texas hospitality but neither submitted to it for jurisdictional purposes. So, they too grow smaller in the mirror as we watch them wave goodbye and affirm the trial court's order of dismissal.

Brian Quinn
Chief Justice