Yfantis v. Balloun

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-03-032-CV

DR. EVANGELOS YFANTIS APPELLANT

V.

MICHAEL BALLOUN, RAINIER APPELLEES

COMPANY AND PATTY BALLOUN

------------

FROM THE 352
ND
 DISTRICT COURT OF TARRANT COUNTY

------------

OPINION

------------

Introduction

This is an interlocutory appeal from the trial court’s order denying Dr. Evangelos Yfantis’s special appearance.  In four issues, Yfantis complains that the trial court erred in denying his special appearance.  We will reverse the trial court’s judgment and render judgment dismissing the case against Yfantis for lack of personal jurisdiction.

Background Facts and Procedural History

John Strength, Bart Malone, and Robert Nolen are Texas residents and co-owners of Makarios Capital Management, LLC (“MCM”), a Texas corporation.  Eye-Gate Technologies (“Eye-Gate”) is a Nevada corporation with its principal place of business in Texas.  Evangelos Yfantis is a resident of Nevada and the sole shareholder and director of Statistical and Software Analysts Incorporated (“SSAI”), a Nevada corporation. 

In the late 1990s, Yfantis invented a video telephone that could be used over the internet.  In 1997, Sharon Vanshell, a college friend, informed him that Strength was interested in his invention.  Yfantis and Strength arranged a meeting in Las Vegas.  Due to his work load, however, Yfantis declined the opportunity to work with Strength. 

In 1999, Strength made several attempts to contact Yfantis, but Yfantis did not return his calls.  Vanshell again contacted Yfantis and asked him to work with Strength.  Yfantis arranged a meeting with Strength at his office in Nevada.  At this meeting, Strength assured Yfantis that he had the infrastructure to market the video telephone and proposed that MCM and SSAI enter into a $500,000 licensing agreement.  Hesitant to rush into an agreement, Yfantis insisted that Strength take the video phone back to Dallas and try it out.  Yfantis purchased a computer and software for Strength so that he could utilize the phone.  Strength then returned to Dallas with the computer and the video phone.   

Two weeks later, Strength returned to Nevada and notified Yfantis that he wanted to make a deal. MCM’s attorney prepared a one-year licensing agreement and forwarded it to SSAI in Nevada.  The agreement contained a choice of law provision providing that the agreement would be governed by Nevada law.  Under the agreement, MCM was to pay the licensing fee in three installments.  The first installment of $25,000 was to be paid upon the execution of the agreement.  A second payment of $275,000 was due May 2, 2000, with the final payment of $200,000 being due two months after the agreement was executed. 

Around the same time, Strength and Malone approached Michael Balloun, President of Rainier Company, and requested a loan for $290,000 to purchase a shell corporation by the name of I-SIM Corporation (“I-SIM”).  Strength and Malone planned to use I-SIM to market Yfantis’s video telephone technology.  They stated that they needed $35,000 as escrow to hold I-SIM until closing.  Balloun, acting on behalf of Rainier, agreed to provide the funding.
(footnote: 1)  To evidence their agreement, Strength, Malone, and Nolen signed a promissory note payable to Balloun.  

On December 17, 1999, Balloun loaned Strength and Malone $35,000 to cover the required escrow.  On February 15, 2000, Balloun loaned them the remaining $255,000 of the purchase price.
(footnote: 2) 

On May 9, Malone and Strength called Balloun and requested an additional $215,000.  They told Balloun that MCM had written a check for $275,000 to Yfantis, which would not clear because of insufficient funds.
(footnote: 3)  Balloun again loaned Smith and Malone the necessary funds.  MCM repaid approximately $100,000 of the $215,000 a short time later; however, the balance remains unpaid. 

In the fall of 2001, Balloun learned that Strength and Malone had not obtained the shell corporation with the loaned funds as promised.  On February 8, 2002, Balloun filed suit against MCM, Malone, Strength, and Nolen alleging claims for breach of contract, conversion, common law fraud, tortious interference with contract, civil conspiracy, and negligent misrepresentation.  On May 9, 2002, Balloun amended its petition to include a claim against Yfantis for constructive trust.  In its amended petition, Balloun contended that “[t]o the extent Defendant Dr. Evangelos Yfantis received any of the monies of Plaintiffs which were delivered to representatives of MCM on or about May 10, 2000, then such funds were received under circumstances justifying the imposition of a constructive trust.”  Balloun argued that Yfantis received the monies by mistake and/or some other wrong or conduct that resulted in his unjust enrichment. 

Yfantis filed a special appearance alleging that the Texas courts had neither general nor specific jurisdiction over him.  Balloun filed a response and a supplemental first amended petition.  In this supplement, it alleged that the trial court had general jurisdiction over Yfantis because he had engaged in systematic and continuous contacts with Texas.  Specifically, Balloun contended that over a two-year period, Yfantis had engaged in substantial commercial transactions and entered into contracts with Texas residents.  Alternatively, it pleaded that he had purposefully traveled to Texas in 2000 and 2001 in connection with the sale and licensing of his video telephone technology.  Balloun also alleged that he had purposeful, systematic, and continuous contacts with these Texas residents by means of written correspondence, phone calls, e-mails, and video telephoning. 

At the special appearance hearing, Bart Malone testified about the contacts that Yfantis had with MCM and Eye-Gate over the course of the agreement.  Malone stated that Yfantis had been to Texas on three occasions and that he had maintained regular contact with MCM via e-mail, telephone, and video phone.  He further testified that Yfantis was both a shareholder in and director of Eye-Gate.  Yfantis offered no live testimony at the hearing; however, the trial court did admit his deposition testimony into evidence. 

After hearing the evidence and arguments of counsel, the trial court denied Yfantis’s special appearance without entering findings of fact or conclusions of law.  Yfantis then filed this interlocutory appeal. 

Standard of Review

Whether a court has personal jurisdiction over a defendant is a question of law.  
BMC Software Belgium, N.V. v. Marchand
, 83 S.W.3d 789, 794 (Tex. 2002).  Thus, the trial court’s determination to grant or deny a special appearance is subject to de novo review. 
 Id
.  When reviewing an oral granting or denying of a special appearance, we review all of the evidence.  
Fish v. Tandy Corp
., 948 S.W.2d 886, 892 (Tex. App.—Fort Worth 1997, writ denied).  Where, as here, the trial court does not issue findings of fact and conclusions of law and the record includes the reporter’s and clerk’s records, we review the trial court’s resolution of disputed fact issues for legal and factual sufficiency and its legal conclusions de novo.  
BMC Software
, 83 S.W.3d at 794-95.  

Personal Jurisdiction

Texas courts may assert personal jurisdiction over a nonresident defendant only if the Texas long-arm statute authorizes jurisdiction and the exercise of jurisdiction is consistent with federal and state due process standards.  
Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.
, 815 S.W.2d 223, 226 (Tex. 1991).  The Texas long-arm statute reaches “as far as the federal constitutional requirements of due process will allow.”  
Id
. Thus, the Texas long-arm statute requirements are satisfied if exercising jurisdiction comports with federal due process limitations.  
Id
. 

The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the long-arm statute.  
BMC Software
, 83 S.W.3d at 793; 
McKanna v. Edgar
, 388 S.W.2d 927, 930 (Tex. 1965).  A defendant who challenges a trial court’s exercise of personal jurisdiction through a special appearance bears the burden of negating all jurisdictional bases.  
Kawasaki Steel Corp. v. Middleton
, 699 S.W.2d 199, 203 (Tex. 1985); 
Fish
, 948 S.W.2d at 891.  
We rely on precedent from the United States Supreme Court as well as our own state’s decisions in determining whether a nonresident defendant has met its burden.  
BMC Software
, 83 S.W.3d at 795.

Under the Due Process Clause of the Fourteenth Amendment, jurisdiction is proper if a nonresident defendant established “minimum contacts” with Texas and maintenance of the suit does not offend “traditional notions of fair play and substantial justice.”  
Int’l Shoe Co. v. Washington
, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945).  The purpose of the minimum-contacts analysis is to protect the defendant from being haled into court when its relationship with Texas is too attenuated to support jurisdiction.  
Schlobohm v. Schapiro
, 784 S.W.2d 355, 357 (Tex. 1990).  Accordingly, we focus upon the defendant’s activities and expectations in deciding whether it is proper to call him before a Texas court.  
Id
.

The minimum-contacts analysis requires that a defendant “purposefully avail” himself of the privilege of conducting activities within Texas, thus invoking the benefits and protections of our laws.  
Burger King Corp. v. Rudzewicz
, 471 U.S. 462, 475-76, 105 S. Ct. 2174, 2183-84 (1985).  The defendant’s activities, whether they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called into a Texas court.  
World-Wide Volkswagen Corp. v. Woodson
, 444 U.S. 286, 297, 100 S. Ct. 559, 567 (1980).  A defendant is not subject to jurisdiction here if his Texas contacts are random, fortuitous, or attenuated.
  See Guardian Royal
, 815 S.W.2d at 226.  Nor can a defendant be haled into a Texas court for the unilateral acts of a third party.  
Id
. at 227.  It is the quality and nature of the defendant’s contacts, rather than their number, that is important to the minimum-contacts analysis.  
Am. Type Culture Collection, Inc. v. Coleman
, 83 S.W.3d 801, 808 (Tex. 2002), 
cert. denied
, 123 S. Ct. 1271 (2003).  

A defendant’s contacts with a forum can give rise to either specific or general jurisdiction.  For a court to exercise specific jurisdiction over a nonresident defendant, two requirements must be met:  (1) the defendant’s contacts with the forum must be purposeful, and (2) the cause of action must arise from or relate to those contacts.  
Guardian Royal, 
815 S.W.2d at 227.  When specific jurisdiction is asserted, the minimum contacts analysis focuses on the relationship among the defendant, the forum, and the litigation.  
Id. 
at 228.

General jurisdiction, on the other hand, allows a forum to exercise jurisdiction over a defendant even if the cause of action did not arise from or relate to a defendant’s contacts with the forum. 
Helicopteros Nacionales de Colombia, S.A. v. Hall
, 466 U.S. 408, 414-16, 104 S. Ct. 1868, 1872-73 (1984); 
Guardian Royal
, 
815 S.W.2d at 228.  General jurisdiction is only present, however, when a defendant’s contacts with a forum are “continuous and systematic,” a more demanding minimum-contacts analysis than specific jurisdiction. 
Guardian Royal
, 815 S.W.2d at 228
.

General Jurisdiction

In his second issue, Yfantis asserts that the trial court erred in denying his special appearance because Balloun failed to show that he had continuous or systematic contacts with Texas.  
After reviewing the record in this case, we conclude that Yfantis’s contacts with the state were neither substantial nor systematic and continuous.  The undisputed evidence clearly establishes that Yfantis: 1) is not, and has never been, a resident of Texas; 2) does not have an office or principal place of business in Texas; 3) does not have or maintain a designated agent for service of process within the state; 4) does not do business in Texas; 5) resides in Las Vegas, Nevada; and 6) is the sole shareholder and director of SSAI, a corporation incorporated in Nevada.  Although he entered into a licensing agreement with MCM, a Texas corporation, the agreement was solicited, negotiated, and signed by Yfantis in Nevada. 
 The video telephone was delivered to MCM’s representatives in Nevada, and the consideration for the agreement was hand-delivered to Yfantis in Nevada.  Further, the licensing agreement contained a choice of law clause indicating that it would be construed under and in accordance with Nevada law.  Thus, the mere fact that Yfantis entered into this contract with a Texas corporation does not support the trial court’s exercise of general jurisdiction over him.  
See Coleman
, 83 S.W.3d at 808 (holding that contract signed and performed by defendant in Maryland did not support finding of general jurisdiction); 
see also U-Anchor Adver., Inc. v. Burt
, 553 S.W.2d 760, 763 (Tex. 1977) (holding that contract solicited, negotiated, and consummated in Oklahoma did not indicate or support an inference that defendant intended to exercise the privilege of doing business in Texas), 
cert. denied
, 434 U.S. 1063 (1978).

Yfantis did make at least two trips to Texas in connection with the licensing agreement,
(footnote: 4) and he maintained regular correspondence with MCM and Eye-Gate via telephone, e-mail, and video phone throughout the duration of their agreement.
(footnote: 5)  Although these actions may have been purposefully directed at Texas, they were made in connection with the licensing agreement.  Thus, standing alone, these contacts are not continuous and systematic enough to constitute “substantial activities.”  
See Dalton v. R & W Marine, Inc.
, 897 F.2d 1359, 1362 n.3 (5
th
 Cir. 1990) (holding that mere purchases, and trips related thereto, even if they occurred regularly, were not, standing alone, a sufficient basis for the assertion of general jurisdiction); 
see also Garner v. Furmanite Australia Pty., Ltd., 
966 S.W.2d 798, 802 (Tex. App.—Houston [1
st
 Dist.] 1998, pet. denied) (holding no general jurisdiction existed over individual who made eight to ten visits to Texas over five-year period for single purpose); 
Hotel Partners v. Craig
, 993 S.W.2d 116, 121 (Tex. App.—Dallas 1994, writ denied) (holding that defendant’s meetings and correspondence with the plaintiff were purposefully directed at Texas, but were insufficient to support the exercise of general jurisdiction).  

Balloun also contends that Yfantis’s position as a shareholder and officer/director of Eye-Gate conferred jurisdiction upon the court.  Generally, a court may not assert general jurisdiction over an individual based on that individual’s association with a corporation unless the corporation is the alter ego of the individual.  
Vosko v. Chase Manhattan Bank, N.A.
, 909 S.W.2d 95, 99 (Tex. App.—Houston [14
th
 Dist.] 1995, writ denied).  Here, the record contains no evidence that Eye-Gate was Yfantis’s alter ego.  There is also no evidence that Yfantis was present at the time of his alleged election to the position of officer/director, that he participated in any of the board of directors meetings, or that he took any actions on behalf of Eye-Gate.  As a matter of fact, in his deposition, Yfantis stated that he was not even aware that he had been elected as a director or officer of Eye-Gate.  Further, the record reveals that he did not purchase the shares of stock he owned.  They were given to him as part of an oral agreement made in connection with the licensing agreement.  Therefore, although the facts establish that Yfantis was a shareholder in and an alleged officer/director of Eye-Gate, they do not establish general jurisdiction over him in his individual capacity.  Accordingly, we hold that Yfantis’s relationship with Eye-Gate did not amount to the type of continuous and systematic contact with Texas that is required for general jurisdiction. 
See Haught v. Agric. Prod. Credit Ass’n
, 39 S.W.3d 252, 263 (Tex. App.—Tyler 2000, no pet.) (holding that defendant who served as director, but was not authorized to sign checks and received no compensation, was not subject to personal jurisdiction in Texas); 
Al-Turki v. Taher
, 958 S.W.2d 258, 263 (Tex. App.—Eastland 1997, pet. denied) (holding that nonresident defendant’s ownership of stock in Texas corporation and participation in shareholder’s meeting were not the type of continuous and systematic contact with Texas required to subject him to general jurisdiction in an unrelated action).  We sustain Yfantis’s second issue.  
 Specific Jurisdiction

Yfantis also complains that there is no basis for specific jurisdiction over him.  Balloun sued Yfantis claiming the imposition of a constructive trust on any money he received from the $215,000 that Balloun loaned MCM in May 2000.
(footnote: 6)  To establish specific jurisdiction, Balloun’s claim for a constructive trust must arise out of or relate to Yfantis’s contacts with the state.  
See Guardian Royal
, 815 S.W.2d at 227-28; 
Schlobohm
, 784 S.W.2d at 358.  In determining whether any such contacts occurred, we look only to Yfantis’s relationship with Balloun and Texas.  
See Clark v. Noyes
, 871 S.W.2d 508, 513 (Tex. App.—Dallas 1994, no writ); 
see also Guardian Royal
, 815 S.W.2d at 228 (holding that specific jurisdiction minimum contacts focuses on relationship among defendant, forum, and litigation).  

The record is devoid of any evidence showing that Yfantis had any contact with Balloun in the state.  Consequently, Balloun have attempted to establish specific jurisdiction over Yfantis by relying on his contacts with MCM and Eye-Gate regarding the licensing agreement.  While these contacts might be sufficient to establish personal jurisdiction over Yfantis in a suit for breach of the licensing agreement, they do not “arise out of” or relate to Balloun’s claim against Yfantis for a constructive trust.  Balloun was not even a party to the licensing agreement.  Therefore, Yfantis’s contacts with Texas in relation to the licensing agreement are not relevant to the issue of specific jurisdiction.  
See
 
Shell Compania Argentina De Petroleo, S.A. v. Reef Exploration, Inc
., 84 S.W.3d 830, 838 (Tex. App.—Houston [1
st
 Dist.] 2002, pet. filed) (holding that agreements entered into by defendant that plaintiff was not a party to are not relevant to a determination of specific jurisdiction); 
Garner
, 966 S.W.2d at 803 (holding that contract negotiated between defendant and a third party, not the plaintiff, could not form the basis for personal jurisdiction).

Balloun also contends that Yfantis’s acceptance of the check for $275,000 from Eye-Gate is sufficient contact to establish specific jurisdiction.  For several reasons, we disagree.  First, the check was made payable to SSAI and was hand-delivered to Yfantis in Nevada by MCM’s representatives.  There is no evidence that Yfantis personally received any of the funds from this check.  Second, although the check was from Eye-Gate and not MCM, the record shows that Yfantis was told that MCM and Eye-Gate were one and the same.  Further, the check was delivered to Yfantis by MCM’s representatives.  Therefore, there was no reason for Yfantis to be suspicious of the fact that the check was from Eye-Gate instead of MCM.  Third, the check was written by Eye-Gate to SSAI.  Yfantis had no contact with Balloun regarding this check.  He did not know, nor did he have any reason to know, that the funds he received from Eye-Gate had been borrowed from Balloun.
(footnote: 7)  Therefore, his acceptance of the check cannot form the basis for specific jurisdiction.  We sustain Yfantis’s first issue.

Conclusion

Because there is no evidence to support the trial court’s conclusion that it had personal jurisdiction over Yfantis, we reverse the trial court’s judgment and render judgment dismissing the case against Yfantis.
(footnote: 8)

JOHN CAYCE

CHIEF JUSTICE

PANEL A: CAYCE, C.J.; HOLMAN and GARDNER, JJ.

DELIVERED: August 14, 2003

FOOTNOTES
1:
For simplicity, we will refer to Balloun and Rainier collectively as “Balloun.”

2:
Sometime between February 2000 and May 2000, however, the shell company’s name changed from I-SIM to Tech Systems, Incorporated, and then to Eye-Gate. 

3:
Yfantis had agreed to hold the check until Eye-Gate could arrange for payment. 

4:
Balloun alleges that Yfantis made three trips to Texas.  The record, however, reveals only two trips.  In March of 2001, Yfantis came to Texas to see Eye-Gate’s new building.  Then, sometime in April or May of the same year, he flew to Austin for a meeting with Eye-Gate and Prodigy. 

5:
In his deposition, Yfantis admitted that he had destroyed all of his e-mails, correspondence, and long distance bills evidencing communication and contacts with Eye-Gate and others in connection with his business dealings after Eye-Gate breached the agreement.  He also stated there were no records of their correspondence via video telephone because it was transmitted over the internet and no long distance fees applied.  
Balloun contends that because Yfantis destroyed this evidence, it is entitled to a presumption that this evidence supports the trial court’s finding of personal jurisdiction.  We disagree.  There is no indication in the record that Yfantis knew or should have known that litigation would ensue at the time he destroyed these records.  

6:
A constructive trust is an equitable remedy created by the courts to prevent unjust enrichment.  
Medford v. Medford
, 68 S.W.3d 242, 248 (Tex. App.—Fort Worth 2002, no pet.).  To establish that a constructive trust exists, the proponent must prove (1) breach of a special trust, fiduciary relationship, or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res.  
Mowbray v. Avery
, 76 S.W.3d 663, 681 n.27 (Tex. App.—Corpus Christi 2002, pet. denied). 

7:
Balloun relies on 
Ginther v. Taub
 to support its contention that the trial court has specific jurisdiction over Yfantis.  675 S.W.2d 724 (Tex. 1984).  In 
Ginther
, however, the Supreme Court of Texas merely held that a constructive trust could be applied against an unknowing beneficiary of a fraud even though he is not the actual wrongdoer.  
Id
. at 728.  This case did not deal with the issue of whether specific jurisdiction in a constructive trust case could be based on a contract to which the appellee was not a party.

8:
In light of our determination that the trial court lacks personal jurisdiction over Yfantis, we need not address the remaining issues.  
See
 
Tex. R. App. P.
 47.1.