

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-17-00131-CV

---

OZO CAPITAL, INC., BILTMORE                                      APPELLANTS
FUNDING II, LLC, AND DFI-OTH,
LLC

V.

VANCE SYPHERS AND CHRIS                                          APPELLEES
EDENS

----------

FROM THE 48TH DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 048-287425-16

----------

## MEMORANDUM OPINION[1]

----------

In this appeal from the trial court's order granting the special appearance

of nonresident appellees Vance Syphers and Chris Edens, appellants OZO

Capital, Inc., Biltmore Funding II, LLC (Biltmore II), and DFI-OTH, LLC contend

---

[1]*See* Tex. R. App. P. 47.4.

that the trial court erred by determining (1) that it did not have general or specific jurisdiction over Syphers, or specific jurisdiction over Edens, and (2) that exercising jurisdiction over both appellees would offend traditional notions of fair play and substantial justice. Because we conclude that the trial court did not err by concluding that exercising jurisdiction over appellees would violate federal due process guarantees, we affirm.

**Background**

In December 2013, Texas resident Mark Hyland and Florida resident Greg Wright encouraged Texas resident Tim Fleet to purchase a pool of mortgage loans for the sole purpose of reselling them. The three created Biltmore II, a Texas limited liability company, to buy and sell the pool. Biltmore II's managing member is NTex Realty, LP, a Texas limited partnership owned by Fleet. The other members of Biltmore II are OZO, a Florida corporation whose principal is Wright, and DFI-OTH, a Texas limited liability company whose principal is Hyland. Fleet funded Biltmore II with a $1.7 million contribution, but Hyland and Wright did not contribute any funds to Biltmore II. The company is structured so that Fleet, through NTex Realty, will receive the return of his initial $1.7 million investment from any money paid to Biltmore II before making any distributions to OZO or DFI-OTH.

Hyland began working on a deal to sell Biltmore II's pool to 3 Star Properties, along with two other note pools: one owned by TM Property Solutions, LLC (TMPS), in which Hyland owns a fifty percent interest, and

2

another owned by Biltmore Funding, LLC, a company controlled by Wright. While 3 Star was negotiating its purchase of the three loan pools, it entered into an agreement to sell a large group of loans from each of the three pools to SED Holdings, LLC, a North Carolina limited liability company, for around $13.8 million. Syphers is the managing member of SED, and Edens was both a member and the president.[2]

3 Star closed its sale to SED in June 2014 before closing its purchase from Biltmore II in July 2014; 3 Star used some of SED's initial $4 million cash payment[3] to fund its purchase of the Biltmore II, Biltmore Funding, and TMPS pools. 3 Star paid Biltmore II $1.5 million cash[4] and executed a promissory note for the remaining $2.7 million purchase price for the Biltmore II loans. In the sale contract with 3 Star, Biltmore II agreed that Brown & Associates, a "custodian and doc prep vendor" located in Harris County, Texas, would keep physical possession of the Biltmore II notes.

SED's contract with 3 Star allowed it to perform due diligence after closing and "put back" loans that it could not resell. After the closing of SED's purchase from 3 Star, Edens travelled to Texas to review the notes; SED decided that at

---

[2]Although Edens's discovery responses in this suit stated that he was a member of SED, he later denied being a member in an affidavit attached to appellees' amended special appearance.

[3]SED executed a promissory note for the rest of the purchase price.

[4]3 Star paid Biltmore Funding $1.625 million and TMPS $360,000.

3

least 600 or more of the notes that it bought from 3 Star—some of them from the Biltmore II pool—were "unsellable" and attempted to give those loans back. For that reason, SED stopped making payments on its promissory note to 3 Star. As a result, 3 Star never made a payment on its note to Biltmore II. Biltmore II sent 3 Star a default notice indicating that it would retain ownership of its pool unless 3 Star timely objected—it did not.

Thus began a series of lawsuits to obtain ownership of the Biltmore II pool. First, SED sued 3 Star, its principal Jamie Johnson, Hyland, and TMPS in North Carolina; Biltmore II was not a party to that suit. SED obtained an injunction prohibiting Hyland from selling the notes in the Biltmore II pool. 3 Star then sued SED in Harris County, Texas. Brown & Associates interpleaded the notes into the Harris County suit. Finally, Biltmore II, acting through Fleet, sued 3 Star in Tarrant County in April 2015. At some point, Fleet became aware that 3 Star had closed its sale to SED before obtaining ownership of the Biltmore II pool. Biltmore II and SED each attempted to obtain the notes from Brown & Associates, who refused to release them because of the multiple title claims.

SED intervened in Biltmore II's Tarrant County suit. In an attempt to salvage the value of the Biltmore II pool, Edens and Fleet discussed selling the Biltmore II notes. Eventually, they agreed to a settlement. Under the settlement agreement, which Syphers approved and signed from North Carolina, SED and Biltmore II "agree[d] to work together and cooperate with each other in the [Tarrant County suit] . . . to achieve an outcome whereby a [j]udgment is

4

rendered . . . declaring [Biltmore II] the owner of the [pool] with clear and negotiable title . . ., free and clear of any claims by or through 3 Star." Biltmore II further agreed that if it obtained such a judgment, it would, with Fleet and SED, "jointly pursue possession of the [pool]" and upon taking possession, liquidate the pool. SED would receive sixty percent of the liquidated proceeds and Biltmore II forty percent.

At the Tarrant County trial, SED and Biltmore II set forth the settlement agreement terms on the record. Fleet and Edens testified. 3 Star did not offer any evidence or sponsor any witnesses, and its counsel admitted that 3 Star had defaulted on its payments to Biltmore II because SED had defaulted on its payments to 3 Star. The trial court signed a judgment declaring Biltmore II the sole owner of the Biltmore II pool, free of 3 Star's and its assignees' claims.

During the fallout from the sale to 3 Star, Fleet's relationship with Hyland and Wright soured to the point that they could no longer work together. Through attorneys, Hyland attempted to buy out NTex Realty's membership interest in Biltmore II. As part of these negotiations, Hyland's counsel attempted to obtain Fleet's verification that Biltmore II had not "disposed of, assigned, released, transferred, or otherwise conveyed" the mortgages in the pool, but Fleet's counsel refused to answer. After Hyland and Wright found out about the settlement agreement with SED, they purported to authorize Biltmore II, along

with OZO and DFI-OTH, to sue Fleet, NTex Realty, appellees, and James Dever[5] for breach of fiduciary duty, fraud, breach of contract, and tortious interference with a contract. Hyland verified appellants' original and amended petitions. OZO and DFI-OTH also called a members' meeting of Biltmore II, at which they voted to expel NTex Realty as managing member.

Appellants alleged in their pleadings that the settlement agreement Biltmore II entered into with SED is a void Mary Carter agreement,[6] characterized it as a "side deal" to transfer Biltmore II's assets to SED, and contended that its purpose was to benefit Fleet to their detriment because Biltmore II's company agreement allows him to "get his money out first."

Appellants sought (1) damages, (2) a temporary restraining order and temporary injunction preventing the conveyance of the Biltmore II pool to any third parties, (3) a temporary injunction ordering that the pool be sold "at a price agreeable to all parties," that the parties mutually agree to hire a broker to effect the sale, and that the sale proceeds be deposited into an escrow account pending the suit's resolution, (4) a court order to wind up and terminate Biltmore II, (5) a declaratory judgment that the Tarrant County judgment in the 3 Star litigation "finally, fully, and forever adjudicated any interest SED . . . had or may

---

[5]Dever is also a member of SED. Appellants eventually nonsuited their claims against Dever.

[6]*See Elbaor v. Smith*, 845 S.W.2d 240, 247 (Tex. 1992) ("A Mary Carter agreement exists when the settling defendant retains a financial stake in the plaintiff's recovery *and* remains a party at the trial of the case.").

6

have had in the Biltmore II Pool—none," and (6) a declaratory judgment that Biltmore II's settlement agreement with SED is void, illegal, and unenforceable, that SED's claims to the pool are barred by res judicata, and that their vote to expel NTex Realty as a member of Biltmore II comported with the Biltmore II company agreement and Texas law.

Regarding jurisdiction over appellees, appellants alleged in their original petition that although appellees both resided in North Carolina,[7] they did business in Texas and the suit arose from that business. In their second amended petition—the live pleading at the time of the special appearance ruling––appellants alleged only that appellees conduct business in Texas, have systematic and continuous contacts with Texas sufficient to establish general jurisdiction, have committed torts in Texas in their individual capacities, and their Texas contacts gave rise to or relate to appellants' claims in this suit. Appellants did not plead any alter ego-based theories of jurisdiction.

Appellees filed a joint special appearance in which they argued (1) that appellants failed to plead jurisdictional facts sufficient to subject them to Texas's jurisdiction, (2) that they are not Texas residents, (3) that they "have no business presence in Texas, own no property in Texas, have no offices in Texas, have no bank accounts in Texas, and have no employees or agents in Texas," (4) that they have not maintained sufficient contacts with Texas or purposefully availed

---

[7]Edens is actually a Tennessee resident.

themselves of the benefits and protections of Texas laws, and (5) that exercising jurisdiction over them would offend traditional notions of fair play and substantial justice. Appellees also attached an affidavit from Syphers averring the same.

After the parties engaged in jurisdictional discovery, appellants moved to strike Syphers's affidavit claiming that his entire affidavit was not credible because he had falsely answered some discovery requests. Appellants attached evidence purporting to show that contrary to Syphers's statements in his affidavit, he had some Texas business connections, Texas business partners, and dealings with Texas companies sufficient to establish general jurisdiction. In response, appellees filed five additional exhibits including an amended affidavit from Syphers. Appellants again objected, arguing that Syphers was continuing to make false statements under oath and that his new affidavit suffered from the same defects as the original.

After a nonevidentiary hearing, the trial court overruled appellants' objections to appellees' special appearance evidence and granted appellees' special appearance. Although appellants timely requested findings of fact and conclusions of law, the trial court declined to file any. Appellants filed this accelerated interlocutory appeal. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (West Supp. 2017).

## Law on Personal Jurisdiction

A Texas court may assert personal jurisdiction over a nonresident defendant only if the requirements of the Texas long-arm statute and of due

8

process under the Fourteenth Amendment are satisfied. U.S. Const. amend. XIV, § 1; Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041–.045 (West 2015); *Bristol-Myers Squibb Co. v. Super. Ct. of Cal.*, 137 S. Ct. 1773, 1779 (2017); *TV Azteca v. Ruiz*, 490 S.W.3d 29, 36 (Tex. 2016), *cert. denied*, 137 S. Ct. 2290 (2017). The Texas long-arm statute permits Texas courts to exercise jurisdiction over a nonresident defendant who "does business" in Texas, which includes committing a tort in whole or in part in the state. Tex. Civ. Prac. & Rem. Code Ann. § 17.042; *TV Azteca*, 490 S.W.3d at 36. Due process is satisfied when (1) the defendant has established minimum contacts with the forum state and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *BNSF Ry. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017); *TV Azteca*, 490 S.W.3d at 36. In determining whether federal due process requirements have been met, we rely on precedent from the United States Supreme Court and other federal courts, as well as our own state's decisions. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002); *TravelJungle v. Am. Airlines, Inc.*, 212 S.W.3d 841, 845–46 (Tex. App.—Fort Worth 2006, no pet.).

The United States Supreme Court has distinguished two types of jurisdiction, depending on the types of contacts: general (all-purpose) jurisdiction and specific (case-linked) jurisdiction. *BNSF Ry.*, 137 S. Ct. at 1558. A trial court may assert general jurisdiction over a nonresident defendant when that defendant's contacts with the forum are so continuous and systematic that they render the defendant "at home" in the forum state. *Daimler AG v. Bauman*, 134

S. Ct. 746, 754 (2014); *TV Azteca*, 490 SW.3d at 37. The paradigm forum for exercising general jurisdiction over an individual is the person's domicile; for a corporation, it is an equivalent place in which the company is fairly regarded as at home, such as its domicile, place of incorporation, or principal place of business. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924, 131 S. Ct. 2846, 2853–54 (2011). Only a limited set of affiliations with a forum will render a defendant amenable to general jurisdiction in a state. *Bristol-Myers Squibb*, 137 S. Ct. at 1780.

In contrast, a trial court may exercise specific jurisdiction over a defendant only if the suit arises out of or relates to the defendant's forum contacts. *Id.* In other words, specific jurisdiction depends on the existence of activity or an occurrence that takes place in the forum state and is therefore subject to its regulation. *Goodyear*, 564 U.S. at 919, 131 S. Ct. at 2851.

**Parties' Burdens in Trial Court and Appellate Standard of Review**

Whether a trial court has personal jurisdiction over a defendant is a question of law, which we review de novo based on all of the evidence. *Searcy v. Parex Res., Inc.*, 496 S.W.3d 58, 66 (Tex. 2016). At trial, the plaintiff bears the initial burden to plead sufficient allegations that would permit the trial court to exercise personal jurisdiction over a defendant. *Id.* Once the plaintiff has done so, the defendant bears the burden to negate all potential bases for personal jurisdiction pleaded by the plaintiff. *Id.* The defendant can negate jurisdiction on a factual basis by presenting evidence that he has no contacts with Texas,

10

effectively disproving the plaintiff's allegations; the plaintiff risks dismissal of its suit if it does not present the trial court with evidence affirming its jurisdictional allegations and establishing personal jurisdiction over the defendant. *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 659 (Tex. 2010). The defendant can also negate jurisdiction on a legal basis by showing that even if the plaintiff's alleged jurisdictional facts are true, (1) those facts are not sufficient to establish jurisdiction, (2) the defendant's Texas contacts fall short of purposeful availment, (3) the claims do not arise from the defendant's Texas contacts, or (4) exercising jurisdiction over the defendant would offend traditional notions of fair play and substantial justice. *Id.*

When the trial court resolves fact questions in making a jurisdictional determination, we may review its findings—express or implied—for both legal and factual sufficiency. *BMC Software*, 83 S.W.3d at 794–95 (holding that when trial court does not make express fact findings, appellate court may review implied findings for sufficiency when appellate record includes both reporter's and clerk's records); *Norstrud v. Cicur*, No. 02-14-00364-CV, 2015 WL 4878716, at *2 (Tex. App.—Fort Worth Aug. 13, 2015, no pet.) (mem. op.); *cf. Ad Villarai, LLC v. Chan Il Pak*, 519 S.W.3d 132, 136 (Tex. 2017) (summarizing "the law governing findings of fact" and noting that when trial court does not respond to a timely request for fact findings, appellate court "must presume the trial court made all the [fact] findings necessary to support the judgment" but that this presumption is rebutted if implied findings are not supported by evidence).

11

In their first issue, appellants urge us to review only the trial court's undisputed implied fact findings for legal and factual sufficiency and to review any implied fact findings dependent on a witness's credibility de novo, affording no deference to the trial court's implied resolution of those facts. According to appellants, the well-established sufficiency standard of review is not applicable to disputed facts when the trial court did not hold an evidentiary hearing on a special appearance. But appellants have not directed this court to any disputed facts that the trial court must have resolved in appellees' favor; instead, the parties dispute the legal significance of the jurisdictional facts developed in the trial court. Thus, we need not carve out an exception to the standard of review established by the supreme court in *BMC* for this appeal.[8] *See Villagomez v.*

---

[8]Appellants rely on *Otis Elevator Co. v. Parmelee*, a death-penalty sanctions appeal which concerned whether the trial court's order complied with the *TransAmerican* requirement that the record show the trial court considered the availability of lesser sanctions or that lesser sanctions would not be sufficient to curb the abuse. 850 S.W.2d 179, 181 (Tex. 1993); *TransAm. Nat. Gas Corp. v. Powell*, 811 S.W.2d 913, 917–18 (Tex. 1991). The supreme court held that the court of appeals erred by holding that because the reporter did not make a record of the sanctions hearing, "the trial court must be presumed to have made all findings necessary to support its judgment." 850 S.W.2d at 181. In doing so, the supreme court distinguished the sanctions scenario from cases presuming findings in support of a judgment after trial. *Id.* Although appellants acknowledge that *Otis Elevator* was not a special appearance case, they contend that its holding is on point because it was a death-penalty sanctions case and "special appearance is, in some instances, the ultimate death penalty." But neither the supreme court nor this court has ever applied the *TransAmerican* factors to a special appearance ruling; thus, *Otis Elevator* is inapposite.

Appellants also contend that "any suggestion that this Court is deference–bound to implied findings under the circumstances presented flies in the face of well over a century of Texas jurisprudence on proper evidentiary review."

12

*Rockwood Specialties, Inc.*, 210 S.W.3d 720, 726–28 (Tex. App.—Corpus Christi 2006, pet. denied) (questioning *BMC* standard of review for implied findings in special appearance appeals but nevertheless applying legal sufficiency standard to facts); *see also Norstrud*, 2015 WL 4878716, at *4 (declining to follow *Villagomez* to the extent it held that a trial court's adoption of parties' proposed findings verbatim is entitled to less deference than other trial court findings and following *BMC* standard requiring appellant to challenge the sufficiency of the evidence supporting any appealed finding).

### Appellants' Pleadings Shifted Burden to Appellees; Both Parties Responded With Evidence

Appellants' pleadings alleging that both appellees conduct business in Texas and committed torts individually in Texas were sufficient to shift the burden to appellees to negate the pleaded bases of jurisdiction. *See Searcy*, 496 S.W.3d at 66; *Griffith Techs., Inc. v. Packers Plus Energy Servs. (USA), Inc.*, No. 01-17-00097-CV, 2017 WL 6759200, at *3 (Tex. App.—Houston [1st Dist.] Dec. 28, 2017, no pet.) (mem. op.); *Lombardo v. Bhattacharyya*, 437 S.W.3d 658, 679 (Tex. App.—Dallas 2014, pet. denied); *Huynh v. Nguyen*, 180 S.W.3d 608, 619 (Tex. App.—Houston [14th Dist.] 2005, no pet.). *But cf. Kelly*, 301 S.W.3d at

Because the trial court need not have resolved any disputed fact issue in making its rulings in this case, we acknowledge—as did the supreme court in *Moncrief Oil Int'l v. OAO Gazprom*, 414 S.W.3d 142, 150 n.4 (Tex. 2013)—that we need not resolve this particular argument. *See* Tex. R. App P. 47.1.

659–60 (holding that plaintiff failed to plead facts sufficient to shift burden to defendants because it did not allege defendants committed torts "in Texas").

Appellees attached Syphers's affidavit to their special appearance, in which he averred the following:

• He is a resident of Wake County, North Carolina, and Edens is a resident of Memphis, Tennessee;

• He is a member and manager of SED, a North Carolina limited liability company, and Edens is a member;

• As an individual, he had nothing to do with SED's purchase of loans from 3 Star and was not involved in the 3 Star Tarrant County litigation other than—in his capacity as manager of SED—authorizing SED to intervene;

• Neither he nor Edens has a business presence in Texas, owns property in Texas, or has offices, bank accounts, employees, or agents in Texas; and

• He would be significantly burdened by having to travel to Fort Worth to defend this suit.

Appellees also attached a copy of the settlement agreement in the 3 Star litigation. Syphers signed the signature block for SED; the title "Managing Member" was listed underneath his signature.

In response to the special appearance, appellants attached Syphers's answers in discovery, in which he represented that in the previous ten years,

14

neither he nor any entity under his control, ownership, or management had owned an interest in any Texas company and that he had no documents that would show any such interest. He also stated that he owned his membership interest in SED through Hickory Knob, LLC. To show that Syphers was being untruthful about having no Texas connections, appellants attached the 2008 Texas certificate of formation of Capital Preservation Group, LLC (CPG), listing Syphers and Dale K. Edwards as managers and H. David Wright as the initial registered agent. The form listed Syphers's address as Durham, North Carolina. Appellants also attached CPG's 2012 franchise tax public information report, signed by Adelene Piper as a member and listing the other officers, directors, or members as Verus Consulting Group, LP, Fourth Line, LLC, and Hickory Knob, LLC of Durham, North Carolina. Appellants urged that Syphers's 2008 interest as a manager of CPG was sufficient to establish general jurisdiction over him.

Regarding specific jurisdiction over both appellees, appellants attached Edens's answers to interrogatories[9] in which he stated that

- in his capacity as President of SED, he traveled to Texas in July 2014 and January 2015 to visit Brown & Associates,

---

[9]Much of appellants' responsive evidence relates to the merits of their tort claims, e.g., when Syphers and Edens first became aware of Fleet and when the three began working together to sell the Biltmore II pool. We do not detail that evidence in this opinion because we do not address the merits of the tort claims in reviewing the special appearance; rather, we instead analyze the quality and nature of appellees' proven contacts in light of appellants' pleaded tort claims. *See Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 790–92 (Tex. 2005).

15

• SED began working with Biltmore II in June 2015 "as an allied party to the dispute with 3 Star," the parties worked together in defending the case and made joint filings with the court, the parties sat at counsel table together and provided a joint presentation to the court, and although he attended the trial as President of SED, he "did not assist, work with, or cooperate with [Biltmore II's] prosecution of its claims against 3 Star . . . in [his] individual capacity,"

• he discussed the settlement agreement with Fleet by phone in May and June 2016, and he exchanged emails with Fleet about the settlement agreement, but only as an officer of SED,

• after discussing the settlement agreement with SED's membership, Syphers approved the agreement and executed it on SED's behalf in Raleigh, North Carolina,

• as President of SED, Edens did not think the terms of the settlement agreement were "optimal," but the agreement "was an effort to maximize the value of the assets" after SED had concluded that receiving sixty percent of the assets was better than potentially receiving 100 percent "after a long and costly litigation," and

• SED understood that at the time of settlement, the pool was already in Biltmore II's name; the settlement agreement contemplated that keeping the assets in Biltmore II's name would make it easier to sell the pool and

16

would help remove any cloud to title; and selling the pool pursuant to a court order or final judgment would maximize the pool's value.

In addition to Edens's discovery answers, appellants relied on the following:

• A reporter's record from the trial in the Tarrant County 3 Star litigation, in which SED and Biltmore II jointly offered evidence, informed the trial court that they had settled their differences, and set forth on the record the terms of the settlement agreement; and

• A July 2015 email from Edens to Fleet and Syphers, among others, indicating that Edens was seeking as high a price as possible for the pool to mitigate SED's damages, that he intended to sell the pool as soon as possible "to minimize my investors['] losses," and that he was "working closely" with Fleet.

Responding to appellants' evidence, appellees filed a supplemental special appearance in which they argued that all of Biltmore II's claims against them in their individual capacities arise out of their involvement with SED as either officers or members. Syphers's affidavit was attached as well as an affidavit from Edens, in which he averred that as an individual, he had nothing to do with SED's purchase of the pool from 3 Star or the Tarrant County 3 Star litigation; he is a resident of Memphis, Tennessee; and he has no business presence in Texas, owns no property in Texas, and has no offices, bank accounts, employees, or agents in Texas.

17

Appellees also attached Hyland's deposition, in which he admitted that the only basis of the claim against Edens was that he "understood . . . Edens personally made the deal with . . . Fleet in Fort Worth" and "personally discussed with . . . Fleet this side backdoor agreement that was signed," but Hyland did not "remember where [that understanding] came from." Hyland also said that appellants sued Syphers individually "[b]ecause . . . he makes all the decisions for SED." Hyland admitted that Biltmore II's claims against appellees are based on the fact that "SED negotiated an agreement . . . with . . . Fleet."

Appellants responded with their own supplemental filing. They attached documents showing that someone named Dale K. Edwards, one of the initial members of CPG, was also a member of Agilis Benefit Services, LLC (ABS), which was formed under Delaware law but in 2001 sought to register a Texas office in Flower Mound; David Wright—also a member—was listed as the initial registered agent. ABS filed Texas franchise tax report forms from 2008-2013 and in 2015. Additional documents showed that ABS was a general partner of Agilis Benefit Services of Texas, L.P. (ABST), a Texas limited partnership formed in 2001, and that Wright was also its registered agent. In 2008, ABST changed its name to Verus Consulting Group, L.P.

Appellants also attached copies of complaints in two different suits against Syphers: one in Mississippi naming Syphers, Syphers Wealth Management, and ABST as defendants and another in North Carolina naming ABS and Syphers, among others, as defendants. The plaintiffs in these suits alleged that Syphers—

18

as an agent for either Fidelity & Guaranty Life Insurance Company or Aviva Life Insurance Company, formerly known as AmerUS Life Insurance Company—sold them life insurance policies for investment purposes and induced them to add a company owned by either ABST or ABS as a co-owner of the policy. The policy owner would then pay an inflated premium through a complicated series of transactions involving an ABS- or ABST-related company, which company then retained the inflated part of the premium. In the Mississippi suit, the plaintiff alleged that ABS developed this life insurance scheme, and Syphers and his company Syphers Wealth Management marketed it nationwide.[10]

Finally, appellants presented evidence of (1) a Policy Delivery Receipt signed by the policy owner on June 11, 2003 and also signed by Syphers as "Agent" confirming receipt of an AmerUS policy, (2) an insurance policy issued by Fidelity listing Syphers as agent, and (3) the underlying Fidelity life insurance application, which contained a fax header stating "Agilis Benefit Service," listed the owner as an "LLC TBD," and was signed by Syphers as agent. Handwriting on the October 24, 2006 application indicates that Syphers was splitting his commission in part with Piper, who had signed CPG's 2012 Texas franchise tax report as a member and ABS's 2008, 2011, and 2012 Texas franchise tax

---

[10]Appellants also attached a copy of a search warrant and underlying affidavit for ABS's U.S. Virgin Islands office and related federal criminal complaint filings, including a search warrant for safety deposit boxes or lock boxes under Edwards's, David Wright's, or Piper's control. Syphers is not mentioned in any of those documents.

reports in various different capacities. Piper also signed a 2015 Texas franchise tax report for ABST as COO.

**No General Jurisdiction Over Syphers**

Appellants argue in part of their second issue that the trial court erred by determining that it could not exercise general jurisdiction over Syphers. Specifically, they contend that his following contacts with Texas are sufficient to establish general jurisdiction:

- his status as a manager of CPG in 2008;

- his "agreement" with Texas entity ABS beginning as early as 2003 and his "agreement" with Texas entity ABST as early as 2006; and

- his 2006 agreement to split commissions with Piper.

First, the record does not show that Syphers had an agreement with either Agilis entity. The evidence that appellants claim shows an agreement between Syphers and the Agilis entities shows only that Syphers was listed as an agent on an insurance policy issued by Fidelity and signed a policy delivery receipt for AmerUS as an agent. Nothing in the record shows that either of these insurance companies were actually Agilis entities or that either was an alter ego of an Agilis entity. To the extent that the pleadings in the Mississippi and North Carolina suits against Syphers and the Agilis entities alleged those insurance companies and Syphers were affiliated with the Agilis entities, those pleadings show nothing more than allegations of such a relationship; they are not proof. See *Laidlaw Waste Sys. (Dallas), Inc. v. City of Wilmer*, 904 S.W.2d 656, 660 (Tex. 1995)

20

("Generally, pleadings are not competent evidence, even if sworn or verified."). Moreover, even if Syphers had a contractual relationship with either Agilis entity, those agreements alone would not be sufficient to establish general jurisdiction over Syphers in Texas. *See, e.g.*, *Yfantis v. Balloun*, 115 S.W.3d 175, 181 (Tex. App.—Fort Worth 2003, no pet.). The same reasoning applies to his agreement to split commissions with Piper.[11] *Id.*

Thus, we are left with a single contact: Syphers's 2008 status as a manager of a Texas limited liability company, CPG. Without evidence of any other contacts sufficient to show that Syphers was essentially "at home" in Texas, this single contact does not suffice to establish general jurisdiction over him. *See Booth v. Kontomitras*, 485 S.W.3d 461, 480 (Tex. App.—Beaumont 2016, no pet.); *Furie Petroleum Co. v. Ben Barnes Grp., L.P.*, No. 03-14-00181-CV, 2015 WL 6459606, at *8 (Tex. App.—Austin Oct. 23, 2015, no pet.) (mem. op.); *Martinez v. de Anda*, No. 13-09-00277-CV, 2010 WL 2543892, at * 1, *17 (Tex. App.—Corpus Christi June 24, 2010, no pet.) (mem. op.); *Yfantis*, 115 S.W.3d at 181–82; *Smith v. Cattier*, No. 05-99-01643, 2000 WL 893243, at *3 (Tex. App.—Dallas July 6, 2000, no pet.) (not designated for publication); *Al-Turki v. Taher*, 958 S.W.2d 258, 263 (Tex. App.—Eastland 1997, pet. denied); *see also Mower v. Nibley*, 2016 UT App 174, ¶ 20–32, 382 P.3d 614, 620–23

---

[11]Likewise, even assuming Edwards, David Wright, and Piper are Texas residents, the mere fact that Syphers had business contacts with them would not subject him to general jurisdiction in Texas. *See, e.g.*, *Daimler AG v. Bauman*, 134 S. Ct. 746, 757–58 & n.11, 760 (2014).

(citing authority for proposition that individual can have only one domicile for any particular purpose and concluding that, even if applying *Daimler*'s analysis of contacts that would render a corporate defendant "at home," plaintiff did not show sufficient contacts to allow court to exercise general jurisdiction over individual); *cf. Daimler AG*, 134 S. Ct. at 760–62 (holding that California court could not exercise jurisdiction over German company based on its subsidiary's assumed "at home" California contacts).

Appellants argue that Syphers should not be rewarded for being untruthful about his Texas contacts in discovery. But even if we discount his assertion that he has no contacts with Texas, the negation of that statement cannot create contacts sufficient to allow the trial court to exercise general jurisdiction over him. Accordingly, we hold that the trial court did not err by concluding as a matter of law that Syphers's contacts with Texas are not sufficient to subject him to general jurisdiction. We overrule the part of appellants' second issue that argues otherwise.

**No Specific Jurisdiction Over Syphers and Edens**

In the second part of their second issue and in their third issue,[12] appellants claim that the trial court erred by determining that it did not have specific jurisdiction over appellees because they committed torts in Texas: Syphers by approving and signing the settlement agreement and Edens by

---

[12]Appellants' fourth issue does not raise a reversible ground but instead argues which law this court should apply.

22

negotiating it and testifying in Tarrant County in the 3 Star litigation. Appellees contend that appellants have not shown that they committed any torts as individuals.

Even if all of an officer's or member's actions are performed in his corporate capacity, the officer or member may be subjected to personal jurisdiction and held liable in his individual capacity for those actions if they were tortious. *Deaton v. Moreno*, No. 02-16-00188-CV, 2017 WL 4683940, at *5 (Tex. App.—Fort Worth Oct. 19, 2017, pet. denied) (mem. op.); *Niehaus v. Cedar Bridge, Inc.*, 208 S.W.3d 575, 581 (Tex. App.—Austin 2006, no pet.); *SITQ E.U., Inc. v. Reata Rest., Inc.,* 111 S.W.3d 638, 651 (Tex. App.—Fort Worth 2003, pet. denied). But that officer's tortious activity will be sufficient to establish specific jurisdiction only if that conduct creates a substantial connection with the forum state. *Walden v. Fiore*, 134 S. Ct. 1115, 1121–22 (2014); *TV Azteca*, 490 S.W.3d at 52–53; *Moncrief Oil Int'l v. OAO Gazprom*, 414 S.W.3d 142, 156 (Tex. 2013). The relationship must arise from the purposeful contacts the individual created with the state rather than with a state resident. *Walden*, 134 S. Ct. at 1122; *see Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 788–89 (Tex. 2005). Mere injury to a forum resident is not a sufficient connection to the forum state. *Walden*, 134 S. Ct. at 1125 (citing *Calder v. Jones*, 465 U.S. 783, 104 S. Ct. 1482 (1984)).

The evidence shows that appellees' only purposeful contacts with Texas are (1) that while in North Carolina, Syphers authorized SED's intervention in the

23

3 Star litigation and approved and executed SED's settlement with Biltmore II and (2) that Edens negotiated the settlement agreement with Fleet while physically outside the state of Texas and testified in furtherance of the settlement agreement in a Tarrant County court.

SED originally attempted to secure title to the Biltmore II notes by filing suit in North Carolina. Neither appellees nor SED chose the forum of the Biltmore II litigation with 3 Star; Biltmore II chose the forum and SED intervened. *See Seguros Afirme, S.A. de C.V. v. Elamex, S.A. de C.V.*, No. 05-16-01465-CV, 2017 WL 3599693, at *7 (Tex. App.—Dallas Aug. 22, 2017, no pet.) (mem. op.) (noting that Mexican insurer did not initiate its interactions with the insured and was instead solicited by a third party, who represented to insurer that insured was a Mexican company with locations in both Mexico and the United States). *But cf. Furie Petroleum*, 2015 WL 6459606, at *7–8 (citing caselaw holding that participating in litigation as a plaintiff constitutes purposeful availment of a forum that can subject a party to specific jurisdiction as a defendant in a different suit in the same forum that arises from the same transaction or operative facts). Neither appellee intervened as an individual in Biltmore II's suit. *Cf. J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882, 131 S. Ct. 2780, 2788 (2011) ("The principal inquiry in cases of this sort is whether *the defendant's* activities manifest an intention to submit to the power of a sovereign." (emphasis added)).

Likewise, a nonresident nonparty's agreement to be bound by a settlement in pending Texas litigation or the nonparty's actions in furtherance of such a

24

settlement do not necessarily establish a purposeful, substantial connection to Texas, even if the nonparty is affiliated with a party to the litigation. *See Mt. McKinley Ins. v. Grupo Mex., S.A.B. de C.V.*, No. 13-12-00347-CV, 2013 WL 1683641, at *3–4, *7 (Tex. App.—Corpus Christi Apr. 18, 2013, no pet.) (mem. op.); *Cerbone v. Farb*, 225 S.W.3d 764, 766, 771–72 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Neither appellee here is a party to the settlement agreement, nor is there any evidence to what extent either of them would obtain a personal benefit from the settlement as individuals.[13] *See Michiana*, 168 S.W.3d at 785; *Cerbone*, 225 S.W.3d at 771. *But cf. Nev. Nat'l Advert., Inc. v. Silverleaf Resorts, Inc.*, No. 05-16-00694-CV, 2017 WL 655949, at *10–11 (Tex. App.—Dallas Feb. 17, 2017, no pet.) (mem. op.) (affirming denial of individual's special appearance when evidence showed that he is the sole owner of defendant corporation over whom trial court had specific jurisdiction and that he is the "beneficiary of its profits").

Although appellants claim that appellees both committed a tort "in Texas," there is no evidence in the record that appellees committed a tort while physically present in Texas. Appellants do not claim that Edens's testimony in the 3 Star litigation was tortious. Instead, the gist of appellants' complaint against appellees is that the effect of the profit-sharing provision of the settlement would ultimately

---

[13]Although the record shows that Syphers owns his interest in SED through his company Hickory Knob, there is no evidence in the record about SED's structure or how it makes distributions to its members.

injure two Texas companies—Biltmore II and DFI-OTH—as well as a Florida company—OZO, upon the sale of the Biltmore II pool. Accordingly, appellants likewise have not shown that appellees directed any alleged individual actions at Texas rather than merely at a Texas resident. *See Walden*, 134 S. Ct. at 1125; *TV Azteca*, 490 S.W.3d at 43; *Booth*, 485 S.W.3d at 486–87.

Based on this record, we hold that appellees' individual involvement in Biltmore II's suit against 3 Star does not show an intent to direct a tort at Texas; instead, their suit-related contacts were tangential to their attempt to recoup as much of SED's losses from the failed 3 Star purchase as possible, to the alleged detriment of at least two Texas residents. *See Searcy*, 496 S.W.3d at 73–75; *Vinmar Overseas Sing. PTE Ltd. v. PTT Int'l Trading PTE, Ltd.*, No. 14-16-00934-CV, 2017 WL 4797842, at *7–8 (Tex. App.—Houston [14th Dist.] Oct. 24, 2017, pet. denied); *Niehaus*, 208 S.W.3d at 581–84; *see also Elbaor*, 845 S.W.2d at 247–50 (describing effect of Mary Carter agreement on trial process and nonsettling defendant). *But cf. TV Azteca*, 490 S.W.3d at 52 (noting that in addition to directing alleged defamatory material at Texas resident and knowing brunt of injury would be felt in Texas, individual also promoted show on which statements were made while physically in Texas and knew show would have a substantial audience in Texas); *Hoskins v. Ricco Family Partners, Ltd.*, Nos. 02-15-00249-CV, 02-15-00253-CV, 2016 WL 2772164, at *7 (Tex. App.—Fort Worth May 12, 2016, no pet.) (mem. op.) (holding that individuals' alleged fraudulent backdating of documents to be filed in Texas property's chain of title were

directed at Texas in light of Texas's interest in maintaining stability and certainty of real property title). Accordingly, we conclude that the trial court did not err by determining that it did not have specific jurisdiction over appellees sufficient to comport with federal due process guarantees. We overrule appellants' second and third issues. We therefore need not address appellants' fifth issue complaining that the trial court erred by determining that exercising jurisdiction over appellants would offend traditional notions of fair play and substantial justice. *See* Tex. R. App. P. 47.1.

## Conclusion

Having overruled appellants' dispositive issues, we affirm the trial court's order granting appellees' special appearance.

/s/ Wade Birdwell
WADE BIRDWELL
JUSTICE

PANEL: WALKER, MEIER, and BIRDWELL, JJ.

DELIVERED: March 29, 2018

27